[Cite as *State v. Green*, 2018-Ohio-3991.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | CASE NO. CA2017-11-161 |
| Plaintiff-Appellee, | : | O P I N I O N<br>10/1/2018 |
| | : | |
| - vs - | : | |
| | : | |
| FREDDIE GREEN, | : | |
| Defendant-Appellant. | : | |


CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 16CR32561


David P. Fornshell, Warren County Prosecuting Attorney, Kirsten A. Brandt, 520 Justice Drive, Lebanon, OH 45036, for plaintiff-appellee

Timothy J. McKenna, 125 East Court Street, Suite 950, Cincinnati, OH 45202, for defendant-appellant


**M. POWELL, J.**

{¶ 1} Defendant-appellant, Freddie Green, appeals his conviction in the Warren County Court of Common Pleas for murder.

{¶ 2} In late fall of 2016, appellant was living with his father, Sidney V. Green ("Father"), in Father's home. Appellant was a recovering drug addict. On December 2, 2016, appellant and Father argued over money while doing laundry. Father then went into

his bedroom where he kept a 9 mm Hi-Point handgun in the top drawer of his dresser. Upon hearing the top drawer open, appellant went to Father's bedroom and found him holding the handgun in his left hand with his back to appellant. Appellant pushed Father from behind and grabbed the handgun away from him. Then, upon hearing Father stating he would get another firearm, appellant shot Father in the back of the head, killing him.

{¶ 3} During the next four hours, appellant contemplated suicide, left Father's home to buy and use heroin and cocaine, returned to Father's home, and called his wife, asking her to come to Father's home. Shortly after his wife arrived, appellant called 9-1-1 at 8:38 p.m. During the 9-1-1 call, appellant first told the operator that he and Father had an altercation a few days earlier during which Father "had the gun and he said he was gonna shoot me and he had the gun loaded, cocked, bullet in the chamber, and my little brother stopped him." Appellant then told the operator that "[a] little bit ago, [Father] started in again and he went and grabbed the gun and I took it from him and I fired and I shot him." Appellant then told the operator that Father was dead.

{¶ 4} Lebanon Police Officer Jeffrey Haller and two other police officers were dispatched to Father's home. A 9 mm Hi-Point handgun was recovered on the kitchen counter. The clip and ammunition were next to the handgun. Father's deceased body was on the bedroom floor, next to the foot of his bed. His skull had an entrance gunshot wound to the back of the head and an exit gunshot wound over the left ear. A fired, 9 mm bullet was recovered in a wall of the bedroom. Inside the partially open top drawer of the dresser were a box for a 9 mm Hi-Point handgun and a box of 9 mm ammunition. No other firearm was found in the home.

{¶ 5} Officer Haller spoke with appellant at the scene. Appellant told the officer that he and Father were involved in a physical altercation a few days before the shooting incident, during which Father choked him and pointed a firearm at him. Sidney Green,

- 2 -

Father's adopted son ("Green"), intervened and broke up the altercation. Appellant next related to Officer Haller the details of the shooting incident as described above. Appellant claimed he shot Father to stop him from getting another weapon, and that he tried to shoot him in the back or shoulder, but hit him in the head. Appellant believed he was two feet away from Father when he shot him.

{¶ 6} Appellant was transported to the police station where he provided a written statement and was interviewed by Detective Greg Spanel on two separate occasions. Appellant's written statement reflects somewhat different details of the incidents than those he related to Officer Haller at the scene. Regarding the prior altercation, appellant stated that Father screamed at him, tried to hit him with the broken handle of a sledgehammer, punched him in the face with his fists, and choked him at which point Green broke up the altercation. Appellant also stated that "at some point[,] [Father] had his 9 mm handgun loaded with one in the chamber [and] stated several times that he had every intentions of shooting me."

{¶ 7} Regarding the shooting incident, appellant stated that while in the laundry room, Father told him that "I was done and * * * that he would just shoot me and end it all." Father then hit him and tried to choke him. Subsequently, while in the bedroom, as Father was attempting to turn around, handgun in hand, appellant shoved him in the back and disarmed him. Upon hearing Father's statement about getting another handgun, appellant "pulled the trigger on his 9 mm."

{¶ 8} Appellant again related a slightly different account of the incidents when interviewed by Detective Spanel. Regarding the prior altercation, appellant told the detective that Father showed the handgun to Green, telling him it was loaded and ready to shoot and that he was ready to shoot appellant. Regarding the shooting incident, appellant told the detective that after he pushed Father, Father's left hand moved toward the front of

his body. Fearing that Father might have a firearm in his pocket, appellant shot him. During the interviews, appellant alternatively stated that Father always had multiple firearms, used to have two or three firearms, and always had a second firearm on him. Appellant further stated he was not sure whether Father had another firearm at the time of the shooting incident and that he believed Father had another firearm somewhere in the house or on him.

{¶ 9} Appellant was indicted in January 2017 on two counts of murder and two counts of felonious assault. Each count included a firearm specification. A first jury trial resulted in a mistrial after the jury failed to reach a verdict. Subsequently, the state dismissed one count of murder and one count of felonious assault and the accompanying firearm specifications. A second jury trial was held on October 23, 2017. The case proceeded on one count of murder in violation of R.C. 2903.02(B) with a firearm specification, and one count of felonious assault in violation of R.C. 2903.11(A)(2) with a firearm specification. Detective Spanel, Officer Haller, Green, and other witnesses testified on behalf of the state. The videotapes of Detective Spanel's interviews of appellant were played for the jury and admitted into the evidence. Appellant, his wife, and two of his siblings testified on behalf of appellant.

{¶ 10} Testimony at trial indicated that at the time of the shooting, Father was 64 years old, five feet, nine inches tall, and weighed 156 pounds, and that he was in poor health. By contrast, appellant was 42 years old, six feet, three inches tall, and weighed 230 pounds. Testimony further revealed that Father was an overbearing "harsh" man, a bully to his children, and always belittling appellant. Appellant's relationship with Father was described as abusive.

{¶ 11} Testimony at trial further indicated that Father always had multiple firearms in his home and truck when appellant and his siblings were growing up. Green testified that

in December 2016, he had been living with Father for a year. During that time, Father only owned one firearm, the 9 mm Hi-Point handgun he acquired in October 2016. Regarding the prior altercation, Green testified that appellant and Father were arguing over money and that Father pushed appellant into a chair and yelled at him. The argument subsided after appellant admitted taking the money to buy drugs. Green denied breaking up the altercation. He further denied that Father hit, kicked, or choked appellant during the altercation, or that Father grabbed his handgun, pointed it at appellant, or threatened to shoot appellant. In fact, there was no mention of a firearm during the altercation.

{¶ 12} Appellant testified that Father always had firearms, "up to four at any given time," and that he kept them loaded. Appellant admitted, however, that when he was living with Father in the fall of 2016, he only saw one firearm, the 9 mm Hi-Point handgun. Regarding the prior altercation, appellant testified that Father hit him, shoved him into a chair, and started choking him until Green intervened. Ten minutes later, Father showed the 9 mm handgun to Green and told him it was loaded and that he "had intentions to shoot" appellant. When asked about Green's testimony as described above, appellant asserted Green was lying.

{¶ 13} Regarding the shooting incident, appellant testified that as he and Father were arguing over money, Father told appellant, "You're done. * * * It's over. You're done," before "storm[ing] back" to his bedroom. Then, upon hearing the top drawer of the dresser open, appellant went to Father's bedroom. Handgun in hand, Father "was turning towards the [bedroom] door" when appellant "nudged him in the back and took the gun from him." As appellant pushed Father, the latter "[went] kind of forward" and then stated he would simply get another firearm. Upon hearing Father's statement and observing Father's "left arm * * * moving forward," appellant shot Father. Appellant explained he was scared because he knew from the past that Father kept his weapons loaded and hid them under

his mattress.[1] Appellant stated he intended to shoot Father in the shoulder and not in the head.

{¶ 14} On cross-examination, appellant acknowledged that while his written statement provides that Father threatened to shoot him and end it all before Father went to his bedroom during the shooting incident, appellant never mentioned Father's threat to the 9-1-1 operator, Officer Haller, or Detective Spanel, or during direct examination. Appellant further admitted that while he testified on direct examination that Father was leaning and reaching towards the left rear side of the bed after appellant disarmed him, appellant never mentioned Father's behavior in his 9-1-1 call, his written statement, or to Officer Haller.

{¶ 15} Appellant conceded that after he grabbed the handgun from Father, the latter did not have a weapon and was thus unarmed, and that appellant, who was behind Father, "could have leveled with him if [he] wanted to." Appellant reluctantly agreed that once Father was unarmed, he could have held Father at gunpoint or "jumped on top of him" instead of shooting him.

{¶ 16} On October 25, 2017, the jury found appellant guilty of murder and felonious assault and the accompanying firearm specifications. During sentencing, the trial court merged the felonious assault count into the murder count and sentenced appellant to an aggregate prison term of 18 years to life.

{¶ 17} Appellant now appeals, raising four assignments of error. The first three assignments of error will be addressed together.

{¶ 18} Assignment of Error No. 1:

---

1. Appellant's testimony regarding Father's weapons was conflicting. On one hand, appellant repeatedly testified that it was Father's habit to keep his weapons loaded, and that when Father showed the 9 mm handgun to Green following the prior altercation, Father specifically stated that the handgun was loaded and that he had every intention of shooting appellant. Yet, appellant also repeatedly testified that when he heard Father open the top drawer of his dresser and next saw Father with the handgun in his hand, he "had no idea" whether the handgun was loaded and was not even sure there was a bullet in the handgun.

{¶ 19} THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT-APPELLANT AS THERE WAS INSUFFICIENT EVIDENCE TO CONVICT.

{¶ 20} Assignment of Error No. 2:

{¶ 21} THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT-APPELLANT BECAUSE THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 22} Assignment of Error No. 3:

{¶ 23} THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT-APPELLANT BECAUSE HE AFFIRMATIVELY SHOWED SELF DEFENSE.

{¶ 24} Appellant argues that his murder conviction is not supported by sufficient evidence and is against the manifest weight of the evidence because the evidence presented at trial showed he was acting in self-defense when he fatally shot Father.

{¶ 25} The concept of legal sufficiency of the evidence refers to whether the conviction can be supported as a matter of law. *State v. Everitt*, 12th Dist. Warren No. CA2002-07-070, 2003-Ohio-2554, ¶ 10. Upon review of the sufficiency of the evidence to support a criminal conviction, an appellate court must examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact would have found all the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus; *Everitt* at ¶ 10.

{¶ 26} To determine whether a conviction is against the manifest weight of the evidence, a reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such

a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Bradbury*, 12th Dist. Butler No. CA2015-06-111, 2016-Ohio-5091, ¶ 17. An appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *Id.* at ¶ 18.

{¶ 27} Appellant argues that the evidence was insufficient to convict him of murder because he established he acted in self-defense.

{¶ 28} Self-defense is an affirmative defense and as such is not considered in a sufficiency of the evidence analysis. *State v. Palmer*, 80 Ohio St.3d 543, 563 (1997); *State v. Johnson*, 10th Dist. Franklin No. 06AP-878, 2007-Ohio-2595, ¶ 30. That is because a challenge to the sufficiency of the evidence does not involve an analysis of the strength of the defendant's evidence, but rather, analyzes the legal adequacy of the state's evidence by deciding whether the case should go to the jury. *See State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160. "An affirmative defense does not negate the legal adequacy of the state's proof for purposes of submitting it to the jury. An affirmative defense involves an excuse or justification for doing an otherwise illegal act. * * * It does not deny the existence of the act; it simply provides a legal justification for it." *State v. Cooper*, 170 Ohio App.3d 418, 2007-Ohio-1186, ¶ 15 (4th Dist.); *Johnson* at ¶ 30.

{¶ 29} Accordingly, "[o]nce the state has satisfied the question of legal adequacy * * *, the question of the relative persuasiveness of [a self-defense affirmative defense] must await a jury's determination and face appellate scrutiny under a manifest weight of the evidence analysis." *Cooper* at ¶ 15. As such, we find no merit to appellant's claim his murder conviction is based on insufficient evidence under the theory he acted in self-defense. *Johnson* at ¶ 31.

{¶ 30} Appellant further argues that his conviction is against the manifest weight of

the evidence because he acted in self-defense.

**{¶ 31}** Appellant was convicted of murder, in violation of R.C. 2903.02(B), which prohibits any person from causing "the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree[.]" The "offense of violence" committed by appellant was felonious assault, in violation of R.C. 2903.11(A)(2), which prohibits any person from "knowingly * * * [c]aus[ing] or attempt[ing] to cause physical harm to another * * * by means of a deadly weapon[.]" Appellant admits he killed Father by shooting him in the back of the head with a firearm. Hence, the evidence at trial established the elements of murder under R.C. 2903.02(B). Appellant argues, however, that his "action was excused by self-defense."

**{¶ 32}** As stated above, self-defense is an affirmative defense; the burden of going forward with evidence of self-defense and the burden of proving self-defense by a preponderance of the evidence is upon the accused. *Palmer*, 80 Ohio St.3d at 563.

**{¶ 33}** To establish self-defense in a case where a defendant used deadly force, the defendant must prove that (1) he was not at fault in creating the situation giving rise to the affray; (2) he had a bona fide belief he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was the use of deadly force; and (3) he did not violate any duty to retreat or avoid the danger. *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus; *State v. Gray*, 12th Dist. Butler No. CA2010-03-064, 2011-Ohio-666, ¶ 43. If a defendant fails to prove any one of these elements, he has failed to demonstrate he acted in self-defense. *Gray* at ¶ 43.[2]

**{¶ 34}** Upon thoroughly reviewing the record, we find that the jury did not lose its way

---

2. Under the third element of self-defense, "there is no duty to retreat from one's own home before resorting to lethal force in self-defense against a cohabitant with an equal right to be in the home." *State v. Thomas*, 77 Ohio St.3d 323, 328 (1997). Because appellant was living in Father's home at the time of the shooting, appellant had no duty to retreat from the home before shooting Father.

and create a manifest miscarriage of justice by rejecting appellant's claim of self-defense and finding him guilty of murder.

{¶ 35} A defendant is privileged to use only that force that is reasonably necessary to repel the attack. *State v. Williford*, 49 Ohio St.3d 247, 249 (1990). In other words, "a defendant must show that the degree of force was 'warranted' under the circumstances and 'proportionate' to the perceived threat." *State v. Waller*, 4th Dist. Scioto Nos. 15CA3683 and 15CA3684, 2016-Ohio-3077, ¶ 26, citing *Palmer*, 80 Ohio St.3d at 564. *See also State v. Gray*, 2d Dist. Montgomery No. 26473, 2016-Ohio-5869; *State v. Wright*, 6th Dist. Lucas No. L-16-1053, 2017-Ohio-1225.

{¶ 36} The evidence establishes that appellant fatally shot Father in the back of the head. Even if appellant's version of the events is believed, he failed to show he had a bona fide belief he was in *imminent* danger of death or great bodily harm. At the time of the shooting, appellant was aware of only one firearm in Father's home, the 9 mm handgun appellant grabbed from Father, disarming him. When appellant shot Father, Father had no weapon and was stumbling forward with his back to appellant. Nor has appellant demonstrated that he could escape "from such danger" only by using deadly force. At the time of the shooting, Father was small in stature and in poor health. By contrast, appellant was much younger and larger in stature. Appellant admitted that he could have held up Father at gunpoint or physically subdued him instead of shooting him. Appellant has not demonstrated that the force reasonably necessary to repel Father's alleged attack required shooting Father in the back of the head. Simply stated, appellant used deadly force when he was not faced with deadly force. The degree of force used by appellant was neither warranted under the circumstances nor proportionate to the perceived threat. *See State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751; *State v. Rice*, 12th Dist. Butler No. CA2003-01-015, 2004-Ohio-697; *State v. Phutseevong*, 6th Dist. Lucas No. L-03-1178, 2005-Ohio-

1031.

{¶ 37} In light of the foregoing, we find that appellant's murder conviction is not against the manifest weight of the evidence. The jury heard all of the testimony, considered the evidence, and found the state's witnesses credible, and we will not disturb the jury's verdict on appeal. The jury did not lose its way simply because it believed the prosecution testimony and disbelieved appellant's account. *See Gray*, 2016-Ohio-5869.

{¶ 38} Appellant's first, second, and third assignments of error are overruled.

{¶ 39} Assignment of Error No. 4:

{¶ 40} THE DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF TRIAL COUNSEL AS GUARANTEED BY SECTION 10, ARTICLE 1, OF THE OHIO CONSTITUTION AND THE SIXTH AND FOURTEENTH AMENDMENTS.

{¶ 41} Appellant argues that his trial counsel was ineffective because he failed to "put on any expert crime scene reconstruction testimony." Appellant asserts that given the fact there were no eye witnesses, and physical and scientific evidence was lacking, a crime scene reconstruction expert would have demonstrated "a possible sequence of events," and thus, counsel's failure to call such an expert "was fatal."

{¶ 42} To prevail on his ineffective assistance of counsel, appellant must show his trial counsel's performance was deficient, and that he was prejudiced as a result. *State v. Petit*, 12th Dist. Madison No. CA2016-01-005, 2017-Ohio-633, ¶ 39; *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052 (1984). Trial counsel's performance will not be deemed deficient unless it fell below an objective standard of reasonableness. *Strickland* at 688. To show prejudice, appellant must establish that, but for his trial counsel's errors, there is a reasonable probability that the result of his trial would have been different. *Id.* at 694.

{¶ 43} The failure to call an expert and instead rely on cross-examination does not

necessarily constitute ineffective assistance of counsel. *State v. Nicholas*, 66 Ohio St.3d 431, 436 (1993); *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 66. Thus, it is generally a legitimate trial strategy for defense counsel not to present expert testimony and instead rely upon cross-examination of a state's expert to rebut evidence of a crime. *State v. Glover*, 12th Dist. Clermont No. CA2001-12-102, 2002-Ohio-6392, ¶ 25. In many criminal cases, such a decision by trial counsel is unquestionably tactical because such an expert might uncover evidence that further inculpates the defendant. *See State v. Walker*, 3d Dist. Seneca No. 13-2000-26, 2001 Ohio App. LEXIS 1008 (Mar. 8, 2001). Further, even if the wisdom of such an approach is debatable, "debatable trial tactics" do not constitute ineffective assistance of counsel. *State v. Clayton*, 62 Ohio St.2d 45, 49 (1980). We find nothing in the record to suggest that trial counsel's failure to call a crime scene reconstruction expert was anything other than a reasonable, tactical decision. *See State v. O'Linn*, 8th Dist. Cuyahoga No. 75815, 2000 Ohio App. LEXIS 1064 (Mar. 16, 2000).

{¶ 44} Furthermore, appellant has failed to establish that, but for his trial counsel's error, there is a reasonable probability that the result of his trial would have been different. Appellant asserts that his case "depended in large part in the jury understanding that [Father] drew the gun first," and that had trial counsel "engaged a crime scene reconstruction expert to demonstrate a possible sequence of events, * * * the case would have been decided the other way." The jury heard from several state witnesses that the physical evidence was consistent with appellant's version of the events, and fully understood that Father pulled his handgun first and then, when disarmed, threatened to get another firearm. Appellant does not disclose what a crime scene reconstruction expert would have stated at trial that was not apparent from the testimony, or how it would have been helpful to the defense and furthered appellant's self-defense claim. Appellant has, therefore, not shown how the expert would have assisted his case, let alone changed the

outcome of the trial.

**{¶ 45}** We therefore find that appellant has failed to prove that he received ineffective assistance of counsel at trial. Appellant's fourth assignment of error is overruled.

**{¶ 46}** Judgment affirmed.

RINGLAND, P.J., and PIPER, J., concur.