[Cite as *State v. White*, 2019-Ohio-4312.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2018-09-107 |
| | : | O P I N I O N |
| - vs - | | 10/21/2019 |
| | : | |
| ROBERT WHITE, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 17CR33421

David P. Fornshell, Warren County Prosecuting Attorney, Kirsten A. Brandt, 520 Justice Drive, Lebanon, Ohio 45036, for appellee

Timothy J. McKenna, 125 East Court Street, Suite 950, Cincinnati, Ohio 45202, for appellant

**RINGLAND, P.J.**

{¶ 1} Robert White appeals his convictions in the Warren County Court of Common Pleas for felony murder and felonious assault. For the reasons described above, this court affirms White's convictions.

{¶ 2} On August 27, 2017, White was at the home of his girlfriend, Nicole Checkawitz, located at 19 Rooks Lane in Franklin, Ohio. Shortly after waking up, he and Checkawitz began arguing. White left the home and went to Checkawitz's neighbor's home

where he began drinking beer.

{¶ 3} Terrence Hall lived nearby and was friends with Checkawitz. Hall scrapped metal for a living. After White left Checkawitz's home, Checkawitz may have spent part of August 27 with Hall looking for scrap metal.

{¶ 4} White continued drinking with the neighbor. Sometime in the early afternoon he was sitting on the neighbor's porch when he saw Checkawitz and Hall walking by. He asked Checkawitz to drive him to Norwood, Ohio. She refused and the two began arguing. Hall intervened in the argument, yelling at White and admonishing him for speaking disrespectfully to Checkawitz. Hall grabbed White and pushed him. The dispute ended with both sides moving away from one another.

{¶ 5} Later that evening, White returned to 19 Rooks Lane, where Checkawitz was home alone with her five children. Five minutes later, a neighbor observed Hall "roaring" down Rooks Lane in his truck towards Checkawitz's home.

{¶ 6} Checkawitz called 9-1-1 and reported a stabbing at 19 Rooks Lane. When police arrived they found White standing outside the home with his hands in the air.[1] They arrested him without incident.

{¶ 7} Emergency responders located Hall in the kitchen. He was deceased, lying on the kitchen floor, and had bled out. He had large stab wounds to the neck, as well as multiple other stab wounds on his body. A bloody knife was sticking out of the face of a base cabinet in the kitchen. A kitchen chair was upturned and lying in a pool of blood.

{¶ 8} Two days after the killing and while in jail, White made a recorded telephone call to his sister. White's sister asked him if he recalled what happened at Rooks Lane. He agreed he did, stating that he and Checkawitz had been arguing, that Checkawitz asked Hall

---

1. The neighbor estimated police arrived approximately five minutes after she saw Hall's truck drive down Rooks Lane.

to come over, and that Hall "kept walking up on me." White stated he felt "real paranoid" so he retrieved a knife from a drawer. Hall then grabbed a chair. In the resulting "tussle," he stabbed Hall in the neck.

{¶ 9} In September 2017, a Warren County grand jury indicted White with one count of murder, a violation of R.C 2903.02(A), one count of felony murder, a violation of R.C. 2903.02(B), and one count of felonious assault, a violation of R.C. 2903.11(A)(2). The felonious assault offense was the underlying offense substantiating the felony murder charge.

{¶ 10} The matter proceeded to a jury trial. Several of Checkawitz's neighbors testified. Police officers testified concerning the crime scene and their investigation. A coroner testified to the injuries suffered by Hall, which included multiple death-inducing stab wounds to the neck, as well as non-deadly stab wounds to the chest, abdomen, thigh, and perineum. The coroner also noted defensive cuts on Hall's right hand. The state played the recorded conversation between White and his sister.

{¶ 11} White testified during his case-in-chief and claimed he acted in self-defense. He said that Hall entered the home and was acting angrily and threateningly toward him. White went into the kitchen and backed up to a drawer as both Hall and Checkawitz advanced on him. He tried to find a knife in a drawer to "show a defense." He picked up a knife and Hall grabbed a chair. Hall was thrusting the chair at him. Fearing he was going to be attacked, he closed his eyes and swung the knife. When he opened his eyes, he realized he had stabbed Hall in the neck. Hall, who was not bleeding, fell to the ground. Fearing Hall would get back up, he stabbed him two more times in the back of the neck. Then, in a "fit of rage," he stabbed him repeatedly all over his body.

{¶ 12} The jury returned a verdict of not guilty on the purposeful murder charge but found White guilty of the counts of felony murder and felonious assault. White appeals,

raising six assignments of error.

{¶ 13} Assignment of Error No. 1:

{¶ 14} THE TRIAL COURT ERRED WHEN IT FAILED TO RECUSE ITSELF FOR A CONFLICT OF BIAS BASED ON PRIOR REPRESENTATION.

{¶ 15} White contends that the trial court judge erred in failing to recuse based on a claim of potential bias. White alleged that the judge had, while in private practice, represented Checkawitz's former husband on a number of matters, including obtaining a divorce from Checkawitz and obtaining a protection order against White. However, "'a court of appeals is without authority to pass upon disqualification or to void the judgment of the trial court upon that basis.'" *State v. Wesley*, 12th Dist. Warren No. CA2008-06-086, 2008-Ohio-6755, ¶ 18, quoting *State v. Ramos*, 88 Ohio App.3d 394, 398 (9th Dist.1993). R.C. 2701.03 outlines the procedure by which a party may seek disqualification, and requires the party to file an affidavit with the Ohio Supreme Court.

{¶ 16} White did not avail himself of the procedure set forth under R.C. 2701.03. Instead, he filed a pro se motion for "dismissal" of the trial judge. Nonetheless, the trial court held a hearing on White's motion. The court stated the reasons why it did not believe there to be any issue of potential bias requiring recusal. Specifically, the court discussed the nature of the representation of the former husband, that the judge had had no direct contact with White through those matters, and that the judge had not obtained any confidential information concerning White through those matters. White agreed with the court's factual assertions. Thus, it does not appear that there was any legitimate basis for recusal. This court overrules White's first assignment of error.

{¶ 17} Assignment of Error No. 2:

{¶ 18} THE TRIAL COURT ERRED WHEN IT FAILED TO AFFIRMATIVELY GIVE JURY INSTRUCTIONS, DENYING A FAIR TRIAL AND DUE PROCESS OF LAW.

- 4 -

{¶ 19} White argues that he was denied a fair trial when the court provided the jury with confusing instructions. White failed to object to the jury instructions and therefore is limited to a review for plain error. Pursuant to Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Plain error exists where there is an obvious deviation from a legal rule that affected the defendant's substantial rights by influencing the outcome of the proceedings. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). "Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise." *State v. Biros*, 78 Ohio St.3d 426, 436 (1997). This court should notice plain error with the utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice. *State v. Widmer*, 12th Dist. Warren No. CA2011-03-027, 2012-Ohio-4342, ¶ 84.

{¶ 20} This court concludes that White cannot demonstrate plain error because no deviation from a legal rule is obvious based upon a review of the charges presented to the jury. The instructions were lengthy in that they required the jury to consider both self-defense and voluntary manslaughter. However, the instructions were accurate statements of the law. There is also no indication in the record that the jury was confused despite the length or complexity of the instructions. During its deliberations, the jury presented the court with one question and it did not relate to the jury instructions or imply any difficulty understanding the charges. Accordingly, this court overrules White's second assignment of error.

{¶ 21} Assignment of Error No. 3:

{¶ 22} THE TRIAL COURT ERRED WHEN IT ALLOWED IN STATEMENTS OF A NON-TESTIFYING PERSON WHO SAID WHAT ANOTHER NON-TESTIFYING PERSON SAID.

{¶ 23} White argues the court erred in admitting the recording of his jailhouse telephone call to his sister. White argues that the recording contained hearsay, i.e., his

sister's statements, and double hearsay, i.e., the sister's referral to alleged statements made by Checkawitz. White also argues that the admission of this evidence violated his Confrontation Clause rights because neither the sister nor Checkawitz testified.

{¶ 24} As an initial matter, the state argues that White failed to raise the Confrontation Clause issue during trial. Evid.R. 103 provides that a claim of error may not be predicated upon a ruling that admits or excludes evidence unless a substantial right of the party is affected and, if the ruling is one admitting evidence, the opponent of the evidence raises a timely objection to the evidence, stating the specific ground of objection, unless the ground of objection is apparent from the context. *State v. Cappadonia*, 12th Dist. Warren No. CA2008-11-138, 2010-Ohio-494, ¶ 28. The record reflects that White's objection at trial was based on hearsay and there is no indication that the court understood that White was challenging the admission of the recording on the basis of a Confrontation Clause violation. As such, we review the Confrontation Clause issue for plain error. *Id.* at ¶ 29. With respect to the hearsay argument, the standard of review is for an abuse of discretion. *State v. Meredith*, 12th Dist. Warren No. CA2004-06-062, 2005-Ohio-2664, ¶ 26.

{¶ 25} The Confrontation Clause of the Sixth Amendment to the United States Constitution preserves the right of a criminal defendant "to be confronted with the witnesses against him * * *." The introduction of an out-of-court statement violates the Sixth Amendment when it is testimonial in nature and the defendant has had no opportunity to cross-examine the declarant. *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, ¶ 13, citing *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354 (2004). A statement is "testimonial" if it is "procured with a primary purpose of creating an out-of-court substitute for trial testimony." *Michigan v. Bryant*, 562 U.S. 344, 131 S.Ct. 1143, 1155 (2011). "Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Id.* The Confrontation Clause

"does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford* at 59, fn. 9, citing *Tennessee v. Street*, 471 U.S. 409, 414, 105 S.Ct. 2078 (1985).

**{¶ 26}** In this case, the telephone call was voluntarily initiated by White and placed to a family member. A prerecorded message at the outset of the call warned White that the conversation was subject to recording. The conversation largely consisted of White answering his sister's questions concerning what happened at 19 Rooks Lane. There is no indication in the record, nor does White argue, that his sister was questioning him as part of any formal investigation by the state. The primary purpose of White's statement was communication with a family member and was not procured with the purpose of creating out-of-court statements for trial and is therefore not testimonial. Accordingly, White has failed to establish a Confrontation Clause violation and therefore has not demonstrated plain error. [2]

**{¶ 27}** With respect to the hearsay argument, White's own statements during the phone call were admissible as admissions by a party-opponent. Evid.R. 801(D)(2). The sister's statements were not hearsay because they were admitted not for the truth of what they asserted but instead to provide meaning and context to White's admissible statements. *State v. Doliboa*, 12th Dist. Warren No. CA2007-07-088, 2008-Ohio-5297, ¶ 25. Similarly, Checkawitz's statements, as conveyed by the sister, were not hearsay because they were not offered to prove the truth of the matter asserted but rather to explain and provide context and meaning for White's repeated denials of Checkawitz's alleged version of events. Because the telephone conversation did not contain inadmissible hearsay, the trial court did not abuse its discretion in admitting it. This court overrules White's third assignment of error.

---

2. The Tenth and Third District Courts of Appeal have held that recordings of telephone conversations in which one of the parties is incarcerated are not testimonial. *State v. Dennison*, 10th Dist. Franklin No. 12AP-718, 2013-Ohio-5535, ¶ 65; *State v. Stewart*, 3d Dist. Seneca No. 13-08-18, 2009-Ohio-3411, ¶ 96.

{¶ 28} Assignment of Error No. 4:

{¶ 29} THE TRIAL COURT ERRED WHEN IT ALLOWED IN UNFAIRLY PREJUDICIAL PHOTOGRAPHS.

{¶ 30} White argues that the court abused its discretion in admitting 28 photographs of the crime scene at 19 Rooks Lane. White argues that the photographs were gruesome, and the danger of unfair prejudice caused by the photographs outweighed any probative value. Additionally, White argues that the photographs were duplicative of less gruesome photographs taken by the coroner after Hall's body had been cleaned of blood during the autopsy procedure. The admission or exclusion of evidence is a matter committed to the sound discretion of the trial court. *Meredith*, 2005-Ohio-2664 at ¶ 26. Absent an abuse of discretion, this court will not reverse the trial court's decision to admit relevant evidence. *Id.*

{¶ 31} Evid.R. 403(A) provides that "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Under Evid.R. 403(A), only evidence that is unfairly prejudicial is excludable. *State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, ¶ 23. Logically, all evidence presented by the state is prejudicial, but not all evidence *unfairly* prejudices a defendant. *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, ¶ 107.

{¶ 32} Upon review, this court concludes that the challenged photographs were neither unfairly prejudicial nor would they have the potential of confusing the issues or misleading the jury. The photographs accurately depicted the conditions present at 19 Rooks Lane where a stabbing death had occurred. That the crime scene was bloody would be expected given that this case involved a homicide by severe neck wounds. Each photograph was distinct and focused on various details regarding the deceased or the crime scene environment. The photographs were further relevant to the state's case in that they aided the jury in understanding how the killing occurred and whether the evidence presented through the

photographs corroborated or conflicted with White's claim of self-defense.

{¶ 33} The photographs were also not duplicative of the coroner's photographs. The coroner's photographs did not depict the crime scene and were focused on the specific injuries suffered by Hall during the knife attack. And simply because the photographs could be regarded as "gruesome" would not lend itself to the conclusion that jurors would not be able to fairly determine the case. For the foregoing reasons, we conclude that the trial court did not abuse its discretion in admitting the photographs. This court overrules White's fourth assignment of error.

{¶ 34} Assignment of Error No. 5:

{¶ 35} THE DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF TRIAL COUNSEL AS GURANTEED BY SECTION 10, ARTICLE 1, OF THE OHIO CONSTITUTION AND THE SIXTH AND FOURTEENTH AMENDMENTS.

{¶ 36} White argues that his trial counsel provided him with constitutionally deficient legal assistance by failing to retain an expert witness in crime scene reconstruction. White argues that this hypothetical expert could have testified as to the sequence of events at the crime scene, which testimony would have corroborated his claims of self-defense and resulted in the jury finding in his favor.

{¶ 37} To prevail on an ineffective assistance of counsel claim, White must show his trial counsel's performance was deficient, and that he was prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052 (1984); *State v. Petit*, 12th Dist. Madison No. CA2016-01-005, 2017-Ohio-633, ¶ 39. Trial counsel's performance will not be deemed deficient unless it fell below an objective standard of reasonableness. *Strickland* at 688. To show prejudice, appellant must establish that, but for his trial counsel's errors, there is a reasonable probability that the result of his trial would have been different. *Id.* at 694.

{¶ 38} The decision to call an expert witness or to instead rely upon cross-examination

of the state's expert witness is within the ambit of trial strategy and generally does not constitute ineffective assistance of counsel. *State v. Nicholas*, 66 Ohio St.3d 431, 436 (1993). Here however, neither the state nor White offered expert testimony concerning the construction of the crime scene. To find a changed outcome would require this court to speculate that a crime scene reconstruction expert could have analyzed the crime scene, rendered a credible opinion, and that such opinion would be in White's favor. Consequently, there is nothing in the record that demonstrates any probability of a changed outcome based on the lack of a crime scene reconstruction witness. This court overrules White's fifth assignment of error.

{¶ 39} Assignment of Error No. 6:

{¶ 40} THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT-APPELLANT BECAUSE HE AFFIRAMTIVELY SHOWED SELF DEFENSE, OR IN THE ALTERNATIVE THE VERDICT SHOULD HAVE BEEN MANSLAUGHTER.

{¶ 41} While White admits causing Hall's death, he claims he proved self-defense. Alternatively, White argues that he committed the killing while under the influence of sudden passion or rage brought on by a serious provocation and thus should have been found guilty of voluntary manslaughter.[3]

{¶ 42} Although the sixth assignment of error is inaccurately phrased as claiming the "trial court erred," White principally argues that the jury's verdict is against the manifest weight of the evidence. a manifest weight of the evidence challenge looks at the inclination of the greater amount of credible evidence to support one side over the other. *State v. Peyton*, 12th Dist. Butler No. CA2015-06-112, 2017-Ohio-243, ¶ 42. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at

---

3. Over the state's objection, the court instructed the jury on voluntary manslaughter.

the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Taylor*, 12th Dist. Fayette No. CA2018-11-021, 2019-Ohio-3437, ¶ 42. In its review, an appellate court "must be mindful the trier of fact has the primary role of weighing the evidence and evaluating witness credibility." *State v. Salinger*, 12th Dist. Butler No. CA2014-10-208, 2015-Ohio-2821, ¶ 15. Consequently, a reviewing court will overturn a conviction for a manifest weight of the evidence challenge "only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal." *State v. Green*, 12th Dist. Warren No. CA2017-11-161, 2018-Ohio-3991, ¶ 26. *See also State v. August,* 12th Dist. Warren No. CA2018-12-136, 2019-Ohio-4126.

{¶ 43} White was convicted of murder in violation of R.C. 2903.02(B), which prohibits any person from causing "the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *." The "offense of violence" committed by White was felonious assault, in violation of R.C. 2903.11(A)(2), which prohibits any person from "knowingly * * * [c]aus[ing] or attempt[ing] to cause physical harm to another * * * by means of a deadly weapon * * *." White admitted he killed Hall by stabbing him in the neck with a knife, which he understood would be a deadly injury. Hence, the evidence at trial established the elements of murder under R.C. 2903.02(B). White argues, however, that the jury lost its way in rejecting his claim of self-defense.

{¶ 44} To establish self-defense in a case where a defendant used deadly force, White had the burden of proving by a preponderance of the evidence that (1) he was not at fault in creating the situation giving rise to the affray, (2) he had a bona fide belief he was in imminent danger of death or great bodily harm and that his only means of escape from such

- 11 -

danger was the use of deadly force, and (3) he did not violate any duty to retreat or avoid the danger. *State v. Palmer*, 80 Ohio St.3d 543, 563 (1997); *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus; *State v. Gray*, 12th Dist. Butler No. CA2010-03-064, 2011-Ohio-666, ¶ 43.

{¶ 45} With respect to the third element, "in most cases, 'a person may not kill in self-defense if he has available a reasonable means of retreat from the confrontation.'" *State v. Thomas*, 77 Ohio St.3d 323, 326 (1997), quoting *State v. Williford*, 49 Ohio St.3d 247, 250 (1990). However, there is no duty to retreat before using force in self-defense in one's own home. *Id.* at 327; R.C. 2901.09.

{¶ 46} Additionally, a defendant is privileged to use that force which is reasonably necessary to repel the attack. *State v. Rice*, 12th Dist. Butler No. CA2003-01-015, 2004-Ohio-697, ¶ 25. In other words, "'a defendant must show that the degree of force was "warranted" under the circumstances and "proportionate" to the perceived threat.'" *State v. Green*, 12th Dist. Warren No. CA2017-11-161, 2018-Ohio-3991, ¶ 35, quoting *State v. Waller*, 4th Dist. Scioto Nos. 15CA3683 and 15CA3684, 2016-Ohio-3077, ¶ 26.

{¶ 47} The evidence at trial indicated that Hall was five foot eight inches tall and weighed 185 pounds. He was 52 years old on the day of his death. White testified that on the day of the killing he stood approximately six feet tall and weighed between 150 and 160 pounds.

{¶ 48} White testified concerning two prior physical altercations with Hall. In one instance, Hall grabbed him by the throat and pinned him to the ground. Hall eventually let him go. In the second instance, Hall had punched him twice in the head. In neither instance did White seek medical treatment, nor did he contact police.

{¶ 49} White testified that on the day of the killing he was living both at his grandmother's home in Madeira, Ohio, and at Checkawitz's home at 19 Rooks Lane.

- 12 -

However, Checkawitz's neighbors testified that White did not reside at 19 Rooks Lane and instead merely "hung out" there or was living there "on and off." White admitted that he was not on the lease at 19 Rooks Lane. White further conceded that there was a protection order in place that prevented him from being in the presence of three of Checkawitz's five children and that, "legally," he should not have been at 19 Rooks Lane that day.

{¶ 50} White described his relationship with Checkawitz as boyfriend/girlfriend, although he admitted the relationship was "shaky." Checkawitz had a tendency to start arguments over "nothing." He did not have any biological children with Checkawitz but considered two of her daughters his own.

{¶ 51} On the morning of August 27, Checkawitz and White began the day by arguing. White left the home and walked up the street to the home of Eric and Amber Salmons. He began drinking beers with Eric while Eric cooked breakfast. The alcohol consumption continued throughout the day. White believed that he may have drank 15 beers and a vodka cocktail throughout the course of the day.

{¶ 52} At some point in the afternoon, White was on the Salmons' porch. He observed Checkawitz and Hall walking together on the street. White asked Checkawitz to drive him to Norwood, Ohio. She refused. White went out on the street and began arguing with her. Hall intervened, yelling at White "not to talk to her that way." Hall grabbed White by the throat and then pushed him. Amber Salmons encouraged White to return to the porch and he did so. White said felt humiliated and angry.

{¶ 53} Later, Eric Salmons and White walked to a nearby bar and had a drink. Eric went to the bathroom and when he came back White was gone. White testified that he went back to the Salmons' house and that he and Amber were watching television on the Salmons' porch. Eric returned, led him inside the Salmons' residence, and directed him to "sleep it off"

on a recliner.[4]

{¶ 54} Eric went to sleep and Amber joined him thereafter. At around 8:30 p.m., Amber heard a loud noise and went to investigate. She found that White had accidentally kicked the filter cover off a window air conditioning unit. She went outside to fix it and White followed her, apologizing. She thought White was "sort of" under the influence of alcohol. White then put his shoes on and walked towards 19 Rooks Lane.

{¶ 55} After White left, Amber began watching television on her porch. Five to seven minutes later, she observed Hall "roaring" down Rooks Lane in his truck and stopping at Checkawitz's home.

{¶ 56} Within minutes, Checkawitz made a 9-1-1 call to report a stabbing at 19 Rooks Lane. Police arrived quickly thereafter and found White standing outside with his hands in the air. He submitted to arrest without incident. His affect was described as "somber." He was photographed and examined at the police station. He had no injuries except a small cut on one finger.

{¶ 57} The state played White's recorded telephone conversation with his sister, which occurred two days after the killing. During the call, the following exchanged occurred:

Sister:     So, do you remember any part of this?

White:      Yeah, uh huh.

Sister:     All of it?

White:      Say what?

Sister:     Do you remember all of it?

White:      Ummm, yeah.

Sister:     What happened?

---

4. Eric Salmons testified that when he returned from the bar he found White asleep on Checkawitz's front porch. He woke him and directed him back to the Salmons' residence.

- 14 -

White: Ummm, I was drinking over at Eric and Amber's and I passed out on the porch for a little bit and then when I woke up, I, uh, walked back over to uh, Nicole's and uh, started arguing about something and uh, she went and got Terry and I don't know, he just, he kept walking up on me and, I grabbed the knife out the drawer, and at that point, he picked up the chair and through the tussle I… yeah.

Sister: That's not what Nicole say.

White: Oh yeah.

Sister: Do you really remember or are you just saying that?

White: Nah, I remember.

{¶ 58} Later in the recording, White reiterated this sequence of events:

White: I came in, I said wom, wom, wom, she went – I laid down on the couch, Terry was somewhere mo' fuckin' obviously nearby and she walked back in with him. Um, we started… kinda arguing – not like arguing, arguing – but then he kept trying to push up on me and I went over to the kitchen drawer and I was standing there and standing there, and I felt real fuckin' uncomfortable, real paranoid, so I grabbed the fuckin' knife, and…he picked up the chair and he started trying to whack it at me, and….

{¶ 59} White testified during his case-in-chief. He said that he walked over to Checkawitz's with the intention of going to bed. He went in the back door, which was unlocked. Checkawitz saw him and started arguing with him. He told her he was just going to sleep on the couch. The couch was located in the front of the home, near the front door. He emptied his pockets, laid down on the couch, and fell asleep.

{¶ 60} Hall came in through the back door.[5] White said that Hall appeared

_____

5. There was no evidence of a forced entry. It appears that Checkawitz contacted Hall and requested his presence in the home.

"cartoonish, almost" and "beyond angry." He was clenching his fists and moving his head back and forth with a "1000-yard stare." Hall did not speak.

{¶ 61} White walked down a hallway, passing Hall, and towards the back door and kitchen, feeling confusion and fear. Checkawitz then walked behind Hall and said something to Hall. Hall looked even angrier. White passed the back door and entered the kitchen as both Hall and Checkawitz started moving closer to him. Hall's body language was making White "really uncomfortable." Hall was "crouching down, almost in a fighting stance" as if to "lunge" at White.

{¶ 62} Trying to be as "calm as possible," White backed up towards a kitchen drawer. He opened the drawer and tried to find a knife as a mean to "show a defense." As he was reaching for the knife, Hall pushed Checkawitz back and grabbed a chair. White pulled out the knife and started yelling at Hall to leave.

{¶ 63} Hall inched closer to him holding the chair "almost like a lion tamer" and pushing it towards him with each step. White was "really afraid of what" Hall was going to do. Hall continued advancing on White and then "reached the chair back as if to strike" him with it. White closed his eyes and swung the knife, in a "flinching motion to ward off the expected hit from the chair." He felt no impact but then when he opened his eyes saw that he had stabbed Hall in the neck. Hall dropped the chair and was staring with a blank expression on his face. When White realized that he had stabbed Hall he experienced a "surreal" feeling.

{¶ 64} White claimed that Hall remained standing with no blood coming out of his body. Next, Hall fell to the ground. At this moment, White felt confusion, fear, and a sick feeling. Standing there, he heard something like the sound of air or gas escaping from Hall's body. He thought Hall was attempting to get back up and so he stabbed him two more times in the back of the neck.

{¶ 65} Next, White became angry. He began thinking of all the embarrassment that

Hall had caused him. So, in a "fit of rage" he just "kept stabbing him and stabbing him." He stopped when he heard Checkawitz and his daughters screaming.

{¶ 66} White claimed he dropped the knife. Checkawitz was going towards Hall's body and White grabbed her by the arm and told her "not to get involved in the crime scene." He then walked outside and waited for the police to arrive.

{¶ 67} The state submitted crime scene photographs that depict Hall laying face down in the kitchen. He and the floor around him are covered in blood. One kitchen chair is overturned. A blood-covered kitchen knife is shown stabbed into the door of a base cabinet.

{¶ 68} A coroner testified that there were multiple stab wounds to Hall's neck. The wounds were catastrophic, completely severing the carotid artery and partially severing the jugular vein. The coroner testified that any of the stab wounds would have caused Hall's death within minutes. Hall had multiple other nondeadly stab wounds on his body, including to the chest, abdomen, upper thigh, perineum, and slicing cuts on the fingers of his right hand, which the coroner opined were defensive wounds.

{¶ 69} Based upon a review of the evidence, this court does not find that the jury lost its way in concluding that White failed to prove each element of self-defense. With respect to the first element, i.e., that he was not at fault in creating the situation, the evidence supports the conclusion that White was at fault. He acknowledged that he should not legally have been at 19 Rooks Lane and the evidence indicates that Checkawitz wanted him to leave. When confronted by Hall and Checkawitz, White was presented with multiple opportunities to leave the home, via the front door which was closest to where he stated he was sleeping, or via the back door, which was on his route from the couch to the kitchen during the confrontation. Instead of leaving, he entered the kitchen and positioned himself with his back to kitchen cabinets. White also made no attempts to leave the home or escape through the use of nondeadly force against Hall.

{¶ 70} White testified that he went for the knife essentially at the same time Hall grabbed a chair. However, this testimony conflicted with his earlier statements to his sister where he stated that he grabbed a knife from the drawer *and then* Hall grabbed a chair. Thus, the jury could reasonably conclude that it was White, not Hall, who wrongfully elevated the fracas to a potential deadly situation. This view of the evidence is also corroborated by the fact that Hall had defensive slice wounds to his right hand, which White could not account for in his version of the incident, and which would indicate that White acted offensively.

{¶ 71} With respect to the second element, i.e., whether White had a bona fide belief he was in imminent danger and deadly force was his only means of escape, both men were similarly sized, although Hall weighed slightly more. White had been on the losing end of previous physical encounters with Hall. However, none of those incidents involved weapons or the use of deadly force. None of those incidents were so serious that White sought medical treatment or contacted police. Based on his prior experiences with Hall, there was no reasonable basis for White to believe that he needed to arm himself with a knife and stab Hall to death as the "only means to escape." As discussed, White had multiple opportunities to leave the home prior to the time he armed himself with a knife.

{¶ 72} Additionally, a knife attack was neither warranted nor proportionate to the alleged threat described by White, which was that Hall was moving towards him with his fists clenched and a look in his eye. The "overkill" aspect of the attack also belies the conclusion that White was acting in self-defense. White admitted stabbing Hall in the neck, which he knew would have been capable of causing Hall's death. White then watched as Hall fell to the floor. At this moment White had an opportunity to escape. However, he did not leave. He stabbed Hall twice more in the neck to ensure he was dead. Then he continued stabbing Hall multiple times on random parts of his body. The brutality of the attack is not indicative of self-defense.

{¶ 73} Finally, with respect to whether White violated a duty to retreat, White testified that he lived at 19 Rooks Lane. However, most of the credible evidence admitted at trial indicated the contrary. The neighbors described White as coming and going from 19 Rooks Lane and that he did not live there. He was not on the lease. He was not legally allowed to be at the property because of a protection order. Thus, White had no privilege under the castle doctrine at 19 Rooks Lane. And as discussed, White had multiple opportunities to leave the home and de-escalate the situation but instead walked by Hall in the hallway, passed a door that led outside, and positioned himself in a place where he could obtain a knife. Accordingly, the jury would not have lost its way in concluding that White failed to prove he acted in self-defense.

{¶ 74} Alternatively, White argues that the jury should have concluded that he was guilty only of voluntary manslaughter. He argues he was asleep when Hall came into the home and approached him in a fighting stance. Hall had a threatening look in his eye and had attacked him previously. He argues that the combination of these factors established a serious provocation sufficient to incite the use of deadly force.

{¶ 75} Voluntary manslaughter is defined as "[n]o person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *." R.C. 2903.03(A). "The provocation must be reasonably sufficient to incite the defendant to use deadly force. For provocation to be reasonably sufficient, it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control." *State v. Shane*, 63 Ohio St.3d 630, 635 (1992).

{¶ 76} The evidence presented at trial would not support a voluntary manslaughter conviction. White testified that he stabbed Hall in the neck out of fear and for self-defense.

The evidence was that any of the stab wounds to the neck would have caused Hall's death. Hall testified that the "fit of rage" came over him only after he had stabbed Hall three times in the neck. Thus, White's own version of events is inconsistent with a conviction for voluntary manslaughter and the jury did not lose its way. Accordingly, this court finds that White's conviction for felony murder is not against the manifest weight of the evidence and overrules White's sixth assignment of error.

{¶ 77} Judgment affirmed.

PIPER and M. POWELL, JJ., concur.