[Cite as *State v. Steckel*, 2026-Ohio-979.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

MADISON COUNTY

STATE OF OHIO,                                           :

    Appellee,                                          :         CASE NO. CA2024-03-006

    - vs -                                                   :         <u>OPINION AND</u>
<u>JUDGMENT ENTRY</u>

                                         :         3/23/2026

JOHN PAUL STECKEL,                                 :

    Appellant.                                         :

CRIMINAL APPEAL FROM MADISON COUNTY COURT OF COMMON PLEAS
Case No. CRI20210141

Nicholas A. Adkins, Madison County Prosecuting Attorney, and Rachel M. Price and Michael S. Klamo, Assistant Prosecuting Attorneys, for appellee.

Shannon M. Treynor, for appellant.

# **O P I N I O N**

**BYRNE, J.**

{¶ 1}  John Paul Steckel appeals from his convictions in the Madison County Court of Common Pleas for multiple counts of aggravated murder. For the reasons discussed below, we affirm Steckel's convictions.

## I. Factual and Procedural Background

{¶ 2} In June 2021, a Madison County grand jury indicted Steckel on a 21-count indictment. The indictment included multiple counts of aggravated murder and murder, and numerous specifications to those counts, including death penalty specifications. The indictment arose following allegations that Steckel shot and killed four individuals in and outside of the apartment of Andrew Swindall, one of the four victims.

{¶ 3} In November 2023, the State dismissed the various death penalty specifications. In January 2024, the State moved to dismiss all counts of the indictment with the exception of four counts of aggravated murder (Counts III, VII, X, and XIII) as well as the firearm specifications and repeat violent offender specifications attached to each of those counts. The matter eventually proceeded to a multiple-day jury trial on those four counts and the accompanying specifications.

### A. The State's Case

{¶ 4} The State introduced the testimony of numerous witnesses, photographs, recordings, and other evidence. We only need to discuss some of that voluminous evidence for the purposes of this opinion. As such, we will summarize certain relevant evidence admitted at trial. We will also refer specifically to the testimony of certain witnesses.

### 1. The Crime Scene and Development of Suspects

{¶ 5} A detective with the West Jefferson Police Department testified that on May 24, 2021, police responded to an apartment at 127 Jackson Street, West Jefferson, Madison County, Ohio. There, police located four deceased individuals. All four had suffered gunshot wounds. The four victims were Andrew Swindall, Shawn Wright, Jamie Lavender (the only female victim), and Leon Daniels.

{¶ 6} Andrew rented the apartment. Shawn and Jamie were also living at the

apartment, apparently as Andrew's guests. Andrew, Shawn, and Jamie's bodies were all located inside the apartment. Leon's body was found outside the apartment, covered with a tarp.

{¶ 7} After investigating the crime scene and collecting shell casings, police were looking for .40 caliber and .22 caliber firearms used in the crime. The majority of shell casings at the scene were .22 caliber. No firearms were found at the scene.

{¶ 8} After reviewing security footage from nearby businesses, police identified a Chevrolet Trax as the last vehicle leaving the apartment the day of the shooting. The Trax left the apartment at approximately noon on May 24, 2021 and traveled in the direction of Columbus, Ohio. The license plate of the Trax and security footage from a gas station led police to focus on Steckel and his girlfriend, Mickael Hairston, in their investigation.

{¶ 9} Law enforcement arrested Steckel on June 2, 2021 for an unrelated matter. West Jefferson police interviewed him approximately one week later concerning what occurred at the apartment. Steckel denied any knowledge of what occurred, and stated he left early in the morning and that everyone was alive when he left.

{¶ 10} Law enforcement took Mickael into custody on June 8, 2021 and interviewed her about the killings. Mickael denied ever having been to West Jefferson and specifically denied being at the apartment. When officers confronted her with video evidence that she was in West Jefferson on the day of the murders, she subsequently admitted that she had been present at the apartment when Steckel killed all four victims.

**2. Mickael Hairston's Testimony**

{¶ 11} Mickael testified that she and Steckel were in a relationship and had been dating since July 2020. During that time, she and Steckel lived mostly in hotel rooms and the homes of friends. They sometimes lived in a vehicle.

{¶ 12} Mickael testified that she and Steckel went to Andrew's apartment sometime

- 3 -

before midnight on May 23, 2021. They went there because they had nowhere else to go and were just driving around. Steckel was driving the Trax.

{¶ 13} When they arrived at the apartment, Andrew was there with two friends, Shawn and Jamie. Shawn and Jamie were sleeping in a bedroom at the apartment. Steckel knew Andrew but was not as familiar with Shawn and Jamie.

{¶ 14} Mickael explained that after she and Steckel arrived at the apartment, everyone started smoking marihuana. Then Steckel, Andrew, and Mickael began smoking "ice"—that is, methamphetamine ("meth"). Steckel supplied the meth. Mickael was not certain if Jamie and Shawn were also smoking meth. Mickael stated she took one hit of meth and stopped because she did not like the way it made her feel. She eventually fell asleep in a chair.

{¶ 15} Mickael testified that Steckel had been using meth consistently in the days leading up to May 24, 2021. She estimated that Steckel had been awake for five days while on this meth binge.

{¶ 16} Mickael further testified that at around 7:00 a.m. on May 24, 2021, she asked Andrew if she could use the shower at the apartment. He told her to go ahead. While she was in the shower, Steckel repeatedly entered and exited the bathroom while talking, saying things like "I want to save her" and "she is so young." Steckel continued to smoke meth as he went in and out of the bathroom.

{¶ 17} When Mickael got out of the shower, Shawn and Jamie had left the apartment. Mickael retrieved her belongings and took them out to the Trax. Steckel came outside and told her, "I want to rob them. He [referring to Andrew] just got some money from his job." Mickael asked Steckel what he was talking about. She told him "don't do that while I'm with you." She told Steckel that Andrew was his friend, and asked why he would talk about doing something like that. Steckel told her, "if I rob them, I'm going to

have to kill them." Mickael explained that Steckel had .22 and .40 caliber guns on him.

{¶ 18} According to Mickael, Steckel then went back into the apartment. Only Andrew and Steckel were in the apartment at the time. Mickael heard a gunshot.

{¶ 19} Steckel then came back outside and said "I did it." He told Mickael that she had to come inside and could not remain outside. Steckel had a gun and so she obeyed him, but she only entered the apartment doorway and looked inside. From there she could see Andrew sitting in a chair. His body was shaking and he was making noises. He had been shot. Steckel began searching Andrew for money but did not find any. Then Steckel attempted to move Andrew's body and asked Mickael for help, but she refused. Steckel then moved Andrew's body off the chair and into the bathroom. About ten minutes later, Steckel and Mickael heard Jamie and Shawn's vehicle pull up outside. Steckel told Mickael to sit down in a chair. She did so. Then Steckel put something on the door so that Jamie and Shawn would not walk inside.

{¶ 20} Jamie and Shawn knocked on the door and Steckel let them in. Jamie entered first, followed by Shawn. As they entered the apartment, Steckel was positioned behind both of them. As Shawn and Jamie walked through the entryway to the living room area, Steckel shot Shawn in the head.

{¶ 21} When Jamie realized what had just happened, she began begging Steckel not to shoot her. Steckel then shot her. Mickael was not certain where on her body Jamie was shot because she was not looking. But after Mickael heard the first shot, she heard Jamie ask Steckel to take her to the hospital. Steckel told Jamie he would take her, but instead he shot her again, multiple times. After those shots, he reloaded his gun and shot Jamie once more.

{¶ 22} Mickael observed Steckel going through Shawn's and Jamie's pockets, looking for money. After finding no money, he began collecting items in the house that he

believed he may have touched and put those items in trash bags. He took the trash bags out to the Trax in three separate trips. Steckel asked Mickael to help him collect these items but she refused. Mickael exited the house when Steckel took the first bag out. She sat in the Trax, shaking and praying to God.

{¶ 23} About five minutes after Mickael began sitting in the Trax, Leon Daniels pulled up to the apartment. Mickael was familiar with Leon from seeing him at hotels where she and Steckel stayed.

{¶ 24} Leon exited his car and asked if Andrew was there. Steckel told him he was not. Then Leon told Steckel, "you got to try this new meth I got." Leon and Steckell began smoking Leon's meth and talking. Leon then noticed that Steckel had blood on his lower calf. Steckel told Leon, "oh, I cut myself."

{¶ 25} Leon began acting differently after seeing the blood. He said, "I'm going to go ahead and get out of here . . . I got to take my girl to the hospital." Mickael told Leon to "go ahead" and "be safe." But meanwhile, Steckel walked behind Leon and shot him in the head. Leon fell to the ground.

{¶ 26} Steckel then grabbed Leon by the ankles and pulled him over to the front door. Steckel covered Leon with a tarp.

{¶ 27} Steckel and Mickael then left the apartment and drove through West Jefferson. But they turned around and drove back to the apartment. Steckel got out and went back into the apartment. Mickael was not sure why they returned.

{¶ 28} When they eventually left West Jefferson, Steckel and Mickael headed towards Columbus. Steckel's plan was to burn the items he took from the apartment. They went to a ravine near an abandoned school. Steckel walked down into the ravine and started burning the items in the trash bags. However, a neighbor on the other side of the ravine saw what was going on and told him he could not have a fire there. The neighbor

eventually came down with a bucket and put out the fire.

{¶ 29} Steckel and Mickael left and eventually went to Mickael's sister's house in Columbus. Steckel burned the rest of the items in Mickael's sister's backyard.

{¶ 30} Mickael denied any knowledge of any plan by any individual at the apartment to rob or hurt Steckel. When asked to describe the nature of the conversations that occurred at the apartment, she described it as "you know, like friends."

{¶ 31} Mickael testified that Steckel threatened her and her family if she told anyone what occurred at the apartment.

### 3. Dr. Bryan Casto's Testimony

{¶ 32} Dr. Bryan Casto, a forensic pathologist and deputy coroner with the Montgomery County Coroner's Office, testified that he conducted the autopsies of Andrew, Shawn, Jamie, and Leon. According to Dr. Casto, the cause of death of all four victims was multiple gunshot wounds. Dr. Casto could not opine as to the order of any gunshots suffered by the victims.

{¶ 33} Andrew suffered five gunshots to the head. Four of these were "contact" wounds, meaning that the gun was in direct contact with the victim upon firing. All five gunshots entered from the right side of Andrew's head. There was also a fracture to the back of Andrew's head, which was not connected to the gunshots.

{¶ 34} Shawn suffered two contact range gunshots. One was to the left side of his head, just below the earlobe. The other was on the right side of his head, near where the ear attaches. Shawn also suffered blunt force trauma to the head.

{¶ 35} Jamie suffered five gunshots. One was at a distance or indeterminate range to her nose. A second was contact range, to the left side of her face. A third was contact range, to the back of her head. A fourth was contact range to the neck. And a fifth was contact range to the neck.

{¶ 36} Leon suffered two contact range gunshots. One was to the right temple and a second was to the left side of his face.

{¶ 37} Dr. Casto testified that he observed similarities in all the victims' wounds. Most wounds were to the sides of the victims' faces and the majority of wounds were in contact range.

{¶ 38} During his direct examination, Dr. Casto identified Exhibits 68, 72, 76, and 82. These exhibits were the autopsy reports he authored for each of the four victims.

#### 4. Inculpatory Statements in Jail

{¶ 39} Two corrections officers testified about statements that Steckel made to them while he was in jail awaiting trial. According to the officers, Steckel told them, "I'm just letting you know, my bitch killed that bitch, and I killed the other three" and "me and my bitch was at the victims' house when we overheard some things about them going to try to pull one over on us." "It was crazy how it went down. My bitch killed that bitch inside the house, and right after I killed the others." Steckel also said, "God put me in the right place at the right time to handle that problem."

#### 5. Chief Brandon Smith's Testimony

{¶ 40} Brandon Smith, the Chief of Police for West Jefferson Police Department, testified that he had been a lead investigator on the case. During his investigation, Chief Smith listened to approximately 1,000 recorded telephone calls that Steckel placed while in jail, awaiting trial. The State played a number of these recordings at trial. With relevance to this appeal, the State played a recording in which Steckel told someone that he would be willing to serve "25 years flat." In other words, Steckel was apparently stating that he would be willing to serve 25 years in prison in exchange for his guilty plea.

{¶ 41} Chief Smith testified that when he first interviewed Steckel, Steckel told him that he had left the apartment at or around 8:00 a.m. to 8:30 a.m. However, video footage

demonstrated that the Trax finally left the apartment at 12:21 p.m. that day. Chief Smith said that in the approximate 1,000 calls that Steckel made from jail, he initially kept to the story that he left the apartment at around 8:00 a.m. However, in later calls, and after he learned that police had obtained evidence to the contrary, Steckel began stating on phone calls that he left the area later.

## B. Defense Case: Steckel's Testimony

{¶ 42} Steckel began his testimony by admitting to shooting and killing all four victims. But he asserted that the victims were involved in a plot to rob and kill him.

{¶ 43} Steckel first described an incident involving a person named "Jimmy Crabtree." This incident, which occurred at some indeterminate time before the shooting at the apartment, allegedly formed some basis for what occurred at the apartment, as Jimmy was related to Andrew.[1]

{¶ 44} Steckel explained that Jimmy was supposed to be working on fixing Steckel's car. But when Steckel visited Jimmy, he found that Jimmy had not fixed his car. He then became angry and shot Jimmy, but did not kill him.[2]

{¶ 45} As to the shooting event at the apartment, Steckel's version of events largely lined up with Mickael's version up until her description of what occurred after she entered the shower. According to Steckel, he showered with Mickael. After getting out of the shower, he did not have a towel available, so he walked through the apartment looking for a towel. While walking through the house, he heard Andrew, Shawn, and Jamie talking behind Shawn and Jamie's closed bedroom door. He heard them say something about

---

1. Steckel testified that the incident with Jimmy occurred six or seven "sleeps" prior to the shooting incident at the apartment. Steckel apparently meant that he had slept six or seven times while binging on meth between the two events.

2. Steckel also claimed that Jimmy did not know he was shot when it occurred, and only later realized he had been shot.

Steckel having shot Jimmy. And he heard someone say "all we've got to do is dig the hole. Leon is going to bury him." Then he heard Andrew ask about Mickael. Jamie stated, "fuck that bitch, she got to go too." Andrew then said "that's a lot of people" and "we can't use this gun" and then asked "how we going to split it?"

{¶ 46} Steckel testified that he understood these comments as indicating that Andrew, Shawn, and Jamie planned to rob him for the drugs and money he had on his person, and that this was partially in retribution for him having shot Jimmy sometime earlier.

{¶ 47} Steckel testified that he backed out of that area and went to retrieve his bag, where he kept his guns and extra magazines. He had a total of four guns with him that day. He and Mickael collected their possessions so they could leave and Mickael went outside to the Trax. Steckel, who was still in the house, then observed Andrew sitting in a chair and Shawn and Jamie sitting on the edge of the bed. Steckel tried to sneak out but "they" said "hold on" and asked him "where are you going?" "They" told him to wait because they had "money about to pull up." This meant that someone was going to arrive to buy drugs from Steckel.

{¶ 48} Steckel then told Andrew, "I know what's going on bro" and "I come out here, I front you dope. I thought we were over that shit with [Jimmy], but are you going to kill me and my bitch, bro?" At that point, Andrew, who had an axe in his hand, jumped up and swung the axe at him. Steckel then heard Shawn, over his right shoulder, tell someone to "get the gun."

{¶ 49} Steckel began shooting at Andrew. Then he shot Shawn and Jamie who were "right here, too." He shot until he cleared his magazine.

{¶ 50} Steckel then told Mickael that they needed to clean up. He got trash bags and told Mickael that anything with "blood, any shells you see on the floor, anything you

remember touching, bag that shit." He explained that he began cleaning because "nobody is going to believe me in fucking Madison County." He found a 9-millimeter gun in Shawn's room and took it.

{¶ 51} Steckel testified that he told Mickael that she had to shoot Jamie (who was already dead) because he did not want to worry about Mickael telling her sister or the police what happened. So he gave her a gun and told her to "put one in her face." He also told Mickael that Jamie's "the bitch that voted you dead." Mickael resisted so he put a pillow over Jamie's face. Then Mickael, without looking, shot Jamie through the pillow one time.

{¶ 52} Steckel admitted moving the bodies. He stated that he began wrapping Andrew because he intended to wrap all the bodies and take them with him. But then he saw a silver SUV arrive outside. He saw that Leon was the driver. Leon got out of the vehicle and Steckel could see that he had a gun. Steckel and Leon started talking and then Leon looked at his legs, saw blood on them, and his eyes became "big."

{¶ 53} Leon began to reach for his gun but Steckel drew first and shot Leon in a "punch type of shot." Leon dropped to the ground and Steckel drug him over to the doorway so he would be out of sight. Then he took Leon's shoe off to get to Leon's gun, which had dropped down his pants. He then kicked Leon in his face and shot him with a .40 caliber gun because he was mad.

{¶ 54} On cross-examination, Steckel admitted shooting Shawn and Jamie when neither had a weapon, but stated that they were going to get a gun. Steckel admitted changing his story multiple times and lying to the police. He also admitted that he changed his story to conform to the evidence against him.

### C. Verdict and Sentence

{¶ 55} The jury returned guilty verdicts on all counts, including all specifications.

The court sentenced Steckel to an aggregate prison term resulting in a term of life in prison without parole.

{¶ 56} Steckel appealed, raising five assignments of error.

## II. Law and Analysis

## A. Autopsy Reports

{¶ 57} Steckel's first assignment of error states:

THE COURT ERRED BY ADMITTING STATE'S EXHIBITS 68, 72, 76 AND 82.

{¶ 58} Steckel argues that the trial court abused its discretion in admitting Exhibits 68, 72, 76, and 82. These exhibits were Dr. Casto's autopsy reports for each of the four victims. Steckel objected to the admission of these documents at the close of the State's case and the trial court overruled the objection and admitted the exhibits.

{¶ 59} Steckel argues that admission of these exhibits was error for two reasons. First, Steckel argues that the reports were not admissible under the public records hearsay exception set forth in Evid.R. 803(8) because that rule excludes reports produced by "law enforcement personnel." Steckel contends that Dr. Casto, a deputy coroner, is "law enforcement personnel." Second, Steckel argues that the autopsy reports were duplicative of Dr. Casto's trial testimony and gave undue weight to his trial testimony.

## 1. Standard of Review

{¶ 60} The admission or exclusion of evidence is a matter committed to the sound discretion of the trial court. *State v. White*, 2019-Ohio-4312, ¶ 30 (12th Dist.). An appellate court will not reverse the trial court's decision to admit or exclude relevant evidence absent an abuse of discretion. *Id.* An abuse of discretion implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State v. Gearhart*, 2018-Ohio-4180, ¶ 13 (12th Dist.).

- 12 -

## 2. Applicable Law: Hearsay, the Hearsay Rule,
## and Admissibility of Autopsy Reports Under Evid.R. 803(8)

{¶ 61} Evid.R. 801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." The hearsay rule, set forth in Evid.R. 802, provides that hearsay is not admissible except as otherwise provided by various enumerated exceptions, including but not limited to exceptions found in Evid.R. 803.

{¶ 62} Relevant to this appeal, Evid.R. 803(8) provides an exception to the hearsay rule for public records and reports:

> Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (a) the activities of the office or agency, or (b) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, *excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel*, unless offered by defendant, unless the sources of information or other circumstances indicate lack of trustworthiness.

(Emphasis added.)

{¶ 63} Steckel argues that Dr. Casto qualifies as "other law enforcement personnel" under this rule and cites two statutes within the Revised Code chapter that apply to the office of the county coroner. First, Steckel cites R.C. 313.09, which discusses the records kept by the coroner's office. That statute provides:

> The coroner shall keep a complete record of and shall fill in the cause of death on the death certificate, in all cases coming under his jurisdiction. All records shall be kept in the office of the coroner, but, if no such office is maintained, then such records shall be kept in the office of the clerk of the court of common pleas. Such records shall be properly indexed, and shall state the name, if known, of every deceased person as described in section 313.12 of the Revised Code, the place where the body was found, date of death, cause of death, and all other available information. The report of the coroner and the detailed findings of the autopsy shall be attached to the report of each case. *The coroner shall promptly deliver, to the*

*prosecuting attorney of the county in which such death occurred, copies of all necessary records relating to every death in which, in the judgment of the coroner or prosecuting attorney, further investigation is advisable. The sheriff of the county, the police of the city, the constable of the township, or marshal of the village in which the death occurred may be requested to furnish more information or make further investigation when requested by the coroner or his deputy. The prosecuting attorney may obtain copies of records and such other information as is necessary from the office of the coroner.* All records of the coroner are the property of the county.

(Emphasis added.)

{¶ 64} Second, Steckel cites R.C. 313.15, which states,

*All dead bodies in the custody of the coroner shall be held until such time as the coroner, after consultation with the prosecuting attorney, or with the police department* of a municipal corporation, if the death occurred in a municipal corporation, *or with the sheriff, has decided that it is no longer necessary to hold such body* to enable him to decide on a diagnosis giving a reasonable and true cause of death, or to decide that such body is no longer necessary to assist any of such officials in his duties.

(Emphasis added.)

{¶ 65} Steckel argues that these statutes demonstrate that the coroner is "law enforcement personnel" because the statutes require the coroner to deliver records to the prosecuting attorney where the coroner determines that "further investigation is advisable," empower the coroner to request that various law enforcement officials furnish more information or undertake additional investigation, and require the coroner to consult with various law enforcement officials before releasing dead bodies.

### 3. Analysis

{¶ 66} Upon review, we do not find that a coroner (an elected official) or a deputy coroner (like Dr. Casto) are "law enforcement personnel" for purposes of Evid.R. 803(8). The two statutes cited by Steckel require the coroner to work with and assist some law

- 14 -

enforcement officials, such as prosecutors or sheriffs, when necessary. However, those statutes do not impose any traditional law enforcement obligations on the coroner, such as enforcing laws or arresting law violators.

{¶ 67} Evid.R. 803(8) does not define "other law enforcement personnel." But other Ohio statutes support the conclusion that coroners are not "law enforcement personnel." R.C. 2901.01(A)(11) defines the similar phrase "law enforcement officer." This statute contains an exhaustive list of such individuals, including sheriffs, sheriffs' deputies, police officers, and prosecuting attorneys, but does not refer to coroners or coroners' employees. Considered holistically, R.C. 2901.01(A)(11) supports the conclusion that a "law enforcement officer" is an individual who performs traditional law enforcement tasks relating to conserving the peace, investigating crimes, arresting violators, and prosecuting crimes.

{¶ 68} On the other hand, Ohio law defines a coroner's duties in primarily medical terms. By statute, a coroner must be a physician who is licensed, in good standing, under Chapter 4731 of the Revised Code to practice medicine and surgery or osteopathic medicine and surgery. R.C. 313.02. After conducting an autopsy, the coroner, deputy coroner, or pathologist must file in the coroner's office a detailed written report describing the observations made during the autopsy and the conclusions drawn. R.C. 313.13(A). Once filed, the report is statutorily defined as a public record. R.C. 313.10(A)(1) and (B).

{¶ 69} Under this framework, we find that autopsy reports are reports of a public office setting forth "matters observed pursuant to duty imposed by law as to which matters there was a duty to report." Evid.R. 803(8)(b). As such, Dr. Casto's autopsy reports were admissible under the public records hearsay exception set forth in Evid.R. 803(8). *See State v. Weaver*, 1995 WL 314672, *4 (9th Dist. May 24, 1995) (holding that the Evid.R. 803[8] exception does not apply to a coroner, who is a medical professional rather than

law enforcement personnel).

{¶ 70} In addition, we note that R.C 313.10(A)(1) provides that a coroner's records, after certification by the coroner, "shall be received as evidence in any criminal or civil action or proceeding in a court in this state, as to the facts contained in those records." Thus, a coroner's reports, if certified, are admissible pursuant to both the Rules of Evidence and statute. *State v. Craig*, 2006-Ohio-4571, ¶ 80 (holding that autopsy reports are admissible both under R.C. 313.10 as well as a business record under Evid.R. 803[6].)

{¶ 71} Nonetheless, Steckel cites an Ohio Supreme Court case for the proposition that a coroner's work in a homicide-related autopsy is "investigative and pertains to law enforcement" and that a coroner "plays an integral role in law-enforcement investigations." *State ex rel. Cincinnati Enquirer v. Pike Cty. Coroner's Office*, 2017-Ohio-8988, ¶ 38. These remarks, however, must be viewed in the context of that case.

{¶ 72} The Ohio Supreme Court in *Pike Cty.* was not addressing whether a coroner or a coroner's employee are "law enforcement personnel" for purposes of Evid.R. 803(8). Instead, the issue presented was whether a coroner's autopsy report was or was not subject to disclosure under a Public Records Act request. More specifically, the issue was whether a portion of the autopsy report could be designated as confidential law enforcement investigatory records ("CLEIR") pursuant to the exception set forth in R.C. 313.10(A)(1) and R.C. 194.43. The Ohio Supreme Court's comments were made in rejecting the argument that only those directly involved in law enforcement could prepare a report that qualified under the CLEIR exception. *Id*. at ¶ 37.

{¶ 73} The supreme court noted that a coroner's work in relation to a homicide "pertains to law enforcement" and therefore could be protected from public release while a law enforcement investigation is ongoing. *Id*. at ¶ 38. The court also observed that whether portions of a final autopsy report constituted CLEIR, and therefore are exempt

from public disclosure, and whether a final autopsy report is admissible at trial are "distinct questions." *Id*. at ¶ 45. Thus, *Pike Cty.* does not involve the question of whether a coroner is "law enforcement personnel" for purposes of Evid.R. 803(8) and only stands for the point that a coroner's report could "pertain" to "law enforcement" in a homicide case for purposes of public records law. Steckel has not claimed that Dr. Casto's reports contained any such confidential investigative materials.[3]

{¶ 74} Steckel also cites an 11th District Court of Appeals case for the proposition that a coroner has the ability to "investigate a violation of law." *State v. Ritchey*, 2023-Ohio-1625 (11th Dist.). However, the court in *Ritchey* specifically found that coroners *are not* police officers or other law enforcement personnel for purposes of Evid.R. 803(8). *Id*. at ¶ 62. And the court noted that even if autopsy records were law enforcement reports, such records could still be admitted as records of regularly conducted activity under Evid.R. 803(6). *Id*. Regardless, the main issue raised in *Ritchey* was whether admission of the autopsy report violated a right of confrontation. *Id.* But confrontation rights are not at issue in this appeal because Dr. Casto testified at trial. As such, *Ritchey* does not support Steckel's argument that Dr. Casto is "law enforcement personnel" for purposes of Evid.R. 803(8).

{¶ 75} For these reasons, we find no merit to the argument that the trial court

---

3. In her dissenting opinion in *Pike Cty.*, Chief Justice Kennedy (at the time an Associate Justice) explained the crucial distinction between the work of law enforcement and the work of a coroner:

> The coroner gathers facts that are used by law enforcement and prosecutors for criminal prosecutions. Law enforcement, not the coroner, investigates any violation of the law that occurred. The coroner's role is not to investigate a violation of the law but to investigate the cause and manner of death.

*Pike Cty.* at ¶ 103 (Kennedy, J., dissenting). While this statement was made in a dissent, the legal disagreement between the majority and the dissent concerned analysis under a different statute than the evidence rule before us. We find Chief Justice Kennedy's simple description of the different types of work performed by law enforcement personnel and coroners to be sound and supportive of our conclusion that a coroner is not "law enforcement personnel" under Evid.R. 803(8).

abused its discretion in admitting the four challenged exhibits under Evid.R. 803(8).

**4. Evid.R. 403(B)**

{¶ 76} Steckel also argues that the admission of both Dr. Casto's testimony and the autopsy reports violated Evid.R. 403(B). That rule states,

> Exclusion Discretionary. Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence.

Evid.R. 403(B).

{¶ 77} Steckel argues that the admission of Dr. Casto's reports "gave undue weight to that evidence, which undoubtedly had undue influence on the jury's deliberations." Steckel, admits, however, that "the scope of that influence is unknown to the Defendant."

{¶ 78} Upon review, we find no abuse of discretion apparent in the court's admission of the autopsy reports based on Evid.R. 403(B). The reports supported and generally mirrored Dr. Casto's testimony, which was comprehensive, and detailed the precise nature of each gunshot wound and other wounds suffered by the victims. The reports contained information relevant to the offenses and that relevance was not "substantially outweighed" by the "needless presentation of cumulative evidence." Given the level of detail provided during Dr. Casto's testimony, it is reasonable that the jury would be assisted by the ability to review his written reports during deliberations.

{¶ 79} Regardless, Steckel admits that he can only speculate as to the extent of "influence" the written autopsy reports caused. Mere speculation cannot establish that Steckel was deprived of a fair trial or otherwise prejudiced. *See State v. Robinson*, 2007-Ohio-354, ¶ 42 (12th Dist.). As such, Steckel's arguments concerning Evid.R. 403(B) are meritless.

{¶ 80} We overrule Steckel's first assignment of error.

**B. Jury Instructions: Accomplice Instruction**

{¶ 81} Steckel's second assignment of error states:

THE COURT ABUSED ITS DISCRETION BY NOT INCLUDING AN ACCOMPLICE INSTRUCTION TO PROVIDE TO THE JURY.

{¶ 82} Steckel argues that the trial court abused its discretion in declining to provide jurors with the instruction on accomplice testimony set forth in R.C. 2923.03(D). That section of the statute on complicity provides that

[i]f an alleged accomplice of the defendant testifies against the defendant in a case in which the defendant is charged with complicity in the commission of or an attempt to commit an offense, an attempt to commit an offense, or an offense, the court, when it charges the jury, shall state substantially the following:

"The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.

It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth.

R.C. 2923.03(D). Steckel was not charged with complicity. But the statute requires the instruction whenever "an alleged accomplice of the defendant testifies against the defendant" and the defendant has been charged with (1) "complicity in the commission of or an attempt to commit an offense," (2) "an attempt to commit an offense," or (3) "an offense." Steckel was charged with "an offense" and thus if an "alleged accomplice" testified against him, the statue would seemingly mandate the instruction be provided. *Id.*

{¶ 83} Steckel states in his appellate brief that his trial counsel requested that the trial court give the R.C. 2923.03(D) accomplice-testimony instruction to the jurors. The

record reflects that the trial court denied Steckel's request for an accomplice-testimony instruction.

{¶ 84} Steckel's argument that this case required an accomplice-testimony instruction is apparently based on his assertion during his trial testimony that Mickael participated in the murders by, at his urging, shooting the already-deceased Jamie, and by traveling with him after the murders as he hid or destroyed evidence. In other words, Steckel suggests that Mickael was his accomplice.

### 1. Applicable Law and Standard of Review

{¶ 85} Jury instructions are matters that are left to the sound discretion of the trial court. *State v. Brannon*, 2015-Ohio-1488, ¶ 20 (12th Dist.). "This court may not reverse a conviction based upon faulty jury instructions unless it is clear that the jury instructions constituted prejudicial error." *State v. Grimm*, 2019-Ohio-2961, ¶ 26 (12th Dist.). Therefore, when reviewing a trial court's jury instructions, this court must affirm a conviction if the trial court's jury instructions, when taken in their entirety, "'fairly and correctly state the law applicable to the evidence presented at trial.'" *State v. Mott*, 2023-Ohio-2268, ¶ 18 (12th Dist.), quoting *State v. Davis*, 2016-Ohio-1166, ¶ 28 (12th Dist.).

### 2. Accomplice Instruction

{¶ 86} In *State v. Sillett*, 2002-Ohio-2596 (12th Dist.), we reviewed the issue of whether a trial court erred in refusing to give an accomplice instruction under R.C. 2923.03(D). In *Sillett*, money and jewelry went missing from the home of Sillett's former employer. *Id.* at ¶ 2. Around the time the property went missing, Sillett gave a bag of jewelry to his fiancé and asked her to separate the precious jewelry from the costume jewelry. He also asked her to pawn some of the jewelry. *Id.* at ¶ 3. The fiancé became suspicious and contacted police. Police investigated, searched Sillett's home, and recovered property belonging to the former employer. *Id.* at ¶ 4. Sillett was convicted of

receiving stolen property. *Id.* at ¶ 5.

{¶ 87} On appeal, Sillett argued that the trial court erred by not instructing the jury on accomplice liability under R.C. 2923.03(D), apparently arguing that the fiancé who testified against him was an "accomplice." In rejecting this argument, we noted that the accomplice liability instruction is not required when the witness has not been charged with complicity as a result of involvement with the defendant's activities. *Id*. at ¶ 17. We noted that several other appellate courts have held that this instruction is not required unless a witness has been indicted. *Id*. (citing cases).

{¶ 88} Nonetheless, Sillett urged this court to adopt a standard that would require the accomplice instruction when the witness "could" have been indicted. We rejected this request, finding it too broad, but stated,

> there may be rare instances in which a person who may be an accomplice is not indicted for a crime, but has motivation to lie or conceal the truth in return for their testimony. For example, an accomplice may be offered immunity in exchange for testimony and never be indicted for the crime. In such cases, there is reason for the witness' testimony to be viewed with the same suspicion as that of an indicted accomplice.

*Id*. at ¶ 19. However, we also noted that the *Sillett* case presented neither scenario discussed in that quote. *Id*. at ¶ 20. That is, the fiancé was never indicted for complicity, nor was there any evidence presented to show that she had received favorable treatment in exchange for testifying against Sillett. *Id*. Therefore, we found that the trial court was not required to give the accomplice-testimony instruction set forth in R.C. 2923.03(D). *Id*.

{¶ 89} Like in *Sillett*, Steckel's case does not present one of the "rare instances" where an unindicted accomplice testified against Steckel. The record reflects that Mickael was never indicted or charged for any acts related to the facts of this case. And there was no evidence presented, even in Steckel's version of events, that Mickael aided or abetted

- 21 -

Steckel in the murders.[4] Moreover, Mickael testified that she had been offered nothing, and no promises had been made to her, in exchange for her testimony against Steckel. As such, Mickael was not an "alleged accomplice" and an accomplice-testimony instruction would not "'fairly and correctly state the law applicable to the evidence presented at trial.'" *Mott*, 2023-Ohio-2268, at ¶ 18 (12th Dist.), quoting *Davis*, 2016-Ohio-1166, at ¶ 28 (12th Dist.). Accordingly, the trial court did not abuse its discretion in deciding not to provide jurors with the R.C. 2923.03(D) instruction.

{¶ 90} We overrule Steckel's second assignment of error.

### C. Jury Instructions: Consciousness of Guilt

{¶ 91} Steckel's third assignment of error states:

THE COURT ABUSED ITS DISCRETION BY INCLUDING A CONSCIOUSNESS OF GUILT INSTRUCTION TO PROVIDE TO THE JURY.

{¶ 92} At trial, the court gave the jurors the following instruction on consciousness of guilt:

CONSCIOUSNESS OF GUILT. Testimony has been admitted indicating that the defendant intimidated a witness and/or attempted to conceal a crime by 1) removing items from the scene and burning them at a different location, 2) disposing of the weapons, 3) making dishonest statement to the police, 4) attempting to influence the testimony of Mickael Hairston. You are instructed that the aforementioned conduct alone does not raise a presumption of guilt, but it may tend to indicate the defendant's awareness of guilt. If you find that the facts do not support that the defendant engaged in the aforementioned conduct, or if you find that some other motive prompted the defendant's conduct, or if you are unable to decide what the defendant's motivation was, then you should not consider this evidence for any purpose. However, if you find that the facts support that the defendant engaged in such conduct and if you decide that the defendant was motivated by a consciousness or awareness of guilt, you may, but are not required to, consider that evidence in deciding whether the defendant is guilty of the crimes charged. You alone will

---

4. Steckel testified that he forced Mickael to shoot Jamie *after* she was deceased.

determine what weight, if any, to give to this evidence.

Steckel objected to this jury instruction, but the trial court overruled the objection.

{¶ 93} On appeal, Steckel argues that the trial court abused its discretion by providing the jurors with this consciousness-of-guilt instruction. He does not argue that the consciousness-of-guilt instruction was an incorrect statement of law. In fact, he concedes that the language derives from *Ohio Jury Instructions*, CR § 409.13. Instead, Steckel argues that the trial court failed to "take precautions to not characterize that evidence [referenced in the instruction] as 'consciousness of guilt' when that same activity could reasonably be motivated by some other purpose."

{¶ 94} As described in our discussion of the previous assignment of error, jury instructions must fairly and correctly state the law applicable to the evidence presented at trial. *Mott*, 2023-Ohio-2268, at ¶ 18 (12th Dist.). We review the trial court's decision to include a requested jury instruction based on the abuse-of-discretion standard. *Brannon*, 2015-Ohio-1488, at ¶ 20 (12th Dist.).

{¶ 95} Steckel does not articulate *how* the trial court should have modified the consciousness-of-guilt instruction to avoid the issue he now claims was error. But Steckel cites *State v. Vasquez*, 2024-Ohio-860 (6th Dist.) in support. In *Vasquez*, the court of appeals held that a trial court did not abuse its discretion by providing jurors with a consciousness-of-guilt instruction based on the defendant's alleged "flight" from the crime scene. *Id*. at ¶ 77. But the appeals court also found that the specific wording of the instruction was potentially misleading. *Id*. at ¶ 80. The instruction stated that evidence had been admitted that the defendant "fled the residence" and was "fleeing the scene" and that jurors could consider whether these actions indicated consciousness of guilt. The appeals court found that this instruction did not provide sufficient detail to the jurors as to what constituted "flight," from a crime scene, which requires more than just departing

a scene and also requires specific acts of avoiding detection, apprehension, or consequences. *Id*. at ¶ 81.

{¶ 96} Steckel's argument regarding the import of *Vasquez* is not clearly explained in his appellate brief. The specific acts identified in the court's instruction as probative of Steckel's consciousness of guilt were not flight, but rather, removing items from the crime scene and destroying them, disposing of weapons used in the offense, making dishonest statements to the police, and attempting to influence Mickael's testimony. These were all proper examples of evidence that could establish consciousness of guilt, which can be shown by specific evidence of concealing evidence of a crime, lying to police, witness intimidation, or acts designed to impede or prevent a witness from testifying. *See State v. Knuff*, 2024-Ohio-902, ¶ 186-187 (attempt to conceal a crime); *State v. Johnson*, 46 Ohio St.3d 96, 100 (1989) (lying about presence at crime scene); *State v. Thomas*, 2015-Ohio-2379, ¶ 13-14 (9th Dist.) (lying to police); *State v. Richey*, 1992-Ohio-44, ¶ 20-22 (threats and witness intimidation).

{¶ 97} Steckel does not articulate how the instruction provided in his case was, as in *Vasquez*, misleading. Steckel does state that the instruction failed to inform the jurors that his actions could have been "motivated by some other purpose." But in fact the instruction did just that when it expressly stated: "if you find that some other motive prompted the defendant's conduct . . . then you should not consider this evidence for any purpose."

{¶ 98} Steckel testified at trial that the reasons he concealed and destroyed evidence was because he did not believe that anyone in Madison County would believe he killed in self-defense. He also testified that he lied to police because, essentially, he did not trust police and always lied to police. Thus, jurors were aware of Steckel's claimed motive for undertaking these actions and could weigh that claimed motive in assessing

whether his actions indicated his consciousness of guilt for the underlying offenses.

{¶ 99} Steckel separately argues that the trial court should have analyzed whether the consciousness-of-guilt *evidence* was inadmissible under Evid.R. 404(B), which limits the admissibility of other crimes, wrongs, or acts. However, Steckel did not object to the admission of this evidence during trial. He also has not separately assigned error to the admission of this evidence on appeal. As such, he has waived any claim that the court erred under Evid.R. 404(B) in admitting evidence of the underlying conduct.

{¶ 100} Turning back to the consciousness-of-guilt instruction, the instruction was a correct statement of the law, applicable to the facts of the case, and reasonable minds could reach the conclusion sought by the specific instruction. *State v. Pringle*, 2008-Ohio-5421, ¶ 51 (12th Dist.). As a result, the trial court did not abuse its discretion in providing the consciousness-of-guilt instruction. *Id*.

{¶ 101} We overrule Steckel's third assignment of error.

### D. Prosecutorial Misconduct

{¶ 102} Steckel's fourth assignment of error states:

> THE STATE ENGAGED IN PROSECUTORIAL MISCONDUCT BY ALLUDING TO RECORDED JAIL CALLS WHEREIN THE DEFENDANT MENTIONED HIS AMENABILITY TO A SPECIFIC TERM OF INCARCERATION.

{¶ 103} Steckel argues that the prosecutor committed prosecutorial misconduct by introducing evidence referring to the content of a recorded jail telephone call in which Steckel indicated that he would be willing to serve "25 years flat." Steckel argues that this evidence constituted inadmissible evidence of plea negotiations under Evid.R. 410.

### 1. Standard of Review

{¶ 104} A court will find prosecutorial misconduct only when the conduct complained of was improper and prejudicially affected substantial rights of the defendant.

*State v. Sanchez-Garza*, 2017-Ohio-1234, ¶ 43 (12th Dist.), citing *State v. Layne*, 2010-Ohio-2308, ¶ 58 (12th Dist.). The focus of an inquiry into allegations of prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. *Id.*, citing *State v. Gray*, 2012-Ohio-4769, ¶ 57 (12th Dist.). Therefore, a finding of prosecutorial misconduct will not be grounds for reversal unless the defendant has been denied a fair trial because of the prosecutor's prejudicial conduct. *Id.* citing *Layne* at ¶ 60. "The Constitution does not guarantee an 'error free, perfect trial . . . .'" *State v. Landrum*, 53 Ohio St.3d 107, 112 (1990), quoting *United States v. Hasting*, 461 U.S. 499, 508 (1983).

**2. Analysis: Whether the State Admitted Evidence of Plea Discussions**

{¶ 105}  During the State's direct examination of Chief Smith, the State played various recorded telephone calls made by Steckel from jail. During one of those calls, which is difficult to understand, Steckel appears to be talking to someone about his willingness to take a plea and indicates that he would be willing to serve between 10 and 25 years.

{¶ 106}  After playing the call, the prosecutor asked Chief Smith whether Steckel had indicated on the call that he would "do 25 years flat?" Chief Smith agreed that Steckel had stated this on the call.

{¶ 107}  There was no objection to this line of questioning, or the jail call. During Chief Smith's cross-examination, defense counsel questioned him at length about this specific recording. Defense counsel's ultimate point with this line of questions was that at the time of the recording, Steckel was facing the death penalty, and thus the statement that he would "do 25 years flat" was less indicative of admitting guilt, and more indicative of accepting an offer that might save his life.

{¶ 108}  Evid.R. 410(A), titled "Inadmissibility of pleas, offers of pleas, and related statements," states in relevant part,

evidence of the following is not admissible in any civil or criminal proceeding against the defendant who made the plea or who was a participant personally or through counsel in the plea discussions:

a plea of guilty that later was withdrawn;

a plea of no contest or the equivalent plea from another jurisdiction;

a plea of guilty in a violations bureau;

any statement made in the course of any proceedings under Rule 11 of the Rules of Criminal Procedure or equivalent procedure from another jurisdiction regarding the foregoing pleas;

any statement made in the course of plea discussions in which counsel for the prosecuting authority or for the defendant was a participant and that do not result in a plea of guilty or that result in a plea of guilty later withdrawn.

{¶ 109} Steckel does not state which provision(s) of Evid.R. 410(A) he believes apply to the "25 years flat" comment. He states in his appellate brief that it is not clear "what the exact offer" was that was "being relayed to" him but that it is "contextually obvious that there was indeed an offer."

{¶ 110} From our review of the record, it is not "contextually obvious" that Steckel was discussing a plea offer when discussing his amenability to serve "25 years flat." We do not know from the record to whom Steckel was speaking. Steckel does not argue that the recording was between himself and his defense counsel, and it is highly unlikely that such a conversation would be recorded by jail officials, let alone played at trial. It seems to us that Steckel was not discussing any specific plea bargain offer and was instead speaking generally to some individual about his willingness to serve 25 years on the charges in lieu of running the risk of being convicted of a capital offense. But we can only speculate based on the record before us.

{¶ 111} On this record, Steckel has not demonstrated that the prosecutor violated

Evid.R. 410(A) or committed prosecutorial misconduct because there is nothing from the record supporting the conclusion that Steckel was referring to plea discussions.

{¶ 112}   Moreover, even if it had been error to admit this evidence, we can discern no prejudice. As will be discussed in response to the fifth assignment of error, overwhelming evidence supported Steckel's convictions and we find no reasonable probability of any changed outcome in the absence of the admission of Steckel's recorded "25 years flat" statement.

{¶ 113}   We overrule Steckel's fourth assignment of error.

### E. Sufficiency/Manifest Weight of the Evidence

{¶ 114}   Steckel's fifth assignment of error states:

> THERE IS INSUFFICIENT EVIDENCE TO SUPPORT THE JURY'S VERDICT AND THE JURY'S VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 115}   Steckel's final assignment of error alleges that insufficient evidence supported the jury verdicts and that his conviction was otherwise against the manifest weight of the evidence.

### 1. Applicable Law: Sufficiency and Manifest Weight of the Evidence

{¶ 116}   "When reviewing the sufficiency of the evidence underlying a conviction, an appellate court examines the evidence to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Madden*, 2024-Ohio-2851, ¶ 31 (12th Dist.), citing *State v. Paul*, 2012-Ohio-3205, ¶ 9 (12th Dist.). Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 117}   "A manifest weight of the evidence challenge examines the 'inclination of

- 28 -

the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other.'" *Madden* at ¶ 32, quoting *State v. Barnett*, 2012-Ohio-2372, ¶ 14 (12th Dist.). To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered. *State v. Graham*, 2009-Ohio-2814, ¶ 66 (12th Dist.).

{¶ 118} In reviewing the evidence, an appellate court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Blankenburg*, 2012-Ohio-1289, ¶ 114 (12th Dist.). An appellate court will overturn a conviction due to the manifest weight of the evidence only in the exceptional case in which the evidence weighs heavily against the conviction. *State v. Zitney*, 2021-Ohio-466, ¶ 15 (12th Dist.).

{¶ 119} "Although the legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different, '[a] determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency.'" *State v. Billingsley*, 2020-Ohio-2673, ¶ 15 (12th Dist.), quoting *State v. Jones*, 2013-Ohio-150, ¶ 19 (12th Dist.).

**2. Analysis**

{¶ 120} In his appellate brief, Steckel does not articulate which element or elements of any of the four counts of aggravated murder were supported by insufficient evidence. In fact, Steckel appears to present no argument as to the sufficiency of the evidence. Instead, he argues that the prosecution presented "one side of a two-sided story" and then discusses his own testimony at trial concerning his claim that he acted in

self-defense. If Steckel is arguing that the State failed to meet its burden of proof on any element of disproving self-defense, as required by R.C. 2901.05(B)(1), he did not articulate that argument in his appellate brief.

{¶ 121} Steckel's argument appears to be more in line with a challenge to the weight of the evidence. That is, Steckel appears to be arguing that his version of events was more credible than the State's version of events and the jury lost its way in convicting him. Steckel then reiterates the other asserted errors we have already addressed in this opinion and states that, in conjunction with those asserted errors, his conviction amounted to a manifest miscarriage of justice. But we have already determined that the previous four assigned errors lacked merit. As such, this "cumulative error" portion of Steckel's manifest weight argument has no merit.

{¶ 122} As to the witness credibility portion of Steckel's argument, simply because the jurors chose to believe the State's evidence and found that the State disproved Steckel's claim of self-defense does not mean that Steckel's conviction is against the manifest weight of the evidence. *See Madden*, 2024-Ohio-2851, at ¶ 45 (12th Dist.). The jury was free to believe or disbelieve any of the State's witnesses and was equally free to disbelieve Steckel's testimony. *State v. Carpenter*, 2023-Ohio-2523, ¶ 92 (12th Dist.); *State v. Hollon*, 2025-Ohio-2725, ¶ 35 (12th Dist.).

{¶ 123} That the jurors did not accept Steckel's version of events and found that the State disproved his claim of self-defense is not surprising. Simply put, Steckel's testimony lacked credibility and was wholly inconsistent with the voluminous medical, photographic, documentary, and testimonial evidence presented by the State.

{¶ 124} Steckel, who admitted to having used meth for multiple days leading up to the murder, claimed to have overheard three of the victims discuss a plot to rob and murder him and Mickael *while the victims would have known that Steckel and Mickael*

- 30 -

*were on the premises*. Instead of immediately leaving the premises, Steckel armed himself with a gun and then stopped when "they" told him to "hold on." He then claimed that Andrew, who was seated, lunged at him with an axe at a time when Steckel was both standing over Andrew and armed with a gun. He then claimed to have shot and killed Shawn and Jamie, who were unarmed but allegedly moving to a room in order to obtain a gun, which he subsequently recovered and disposed of. And then he claimed to have forced his girlfriend to shoot Jamie's deceased body in the head, to ensure that she would be not speak to anyone about what occurred.

{¶ 125} Steckel's testimony as to how he shot the victims was, in most respects, vague. But it was also inconsistent with the medical evidence establishing how the victims were shot at point blank range to the sides of the head. Steckel had no explanation for why the medical evidence, including Dr. Casto's testimony, contradicted his version of events. He could not provide any details as to how he shot the victims and only remembered shooting.

{¶ 126} Steckel's credibility was further undercut by his actions following the murders. After killing four people, allegedly in self-defense, he immediately began attempting to hide any evidence of his involvement. When later interviewed by police, he lied and denied any involvement. The evidence also revealed that after Steckel began learning of evidence obtained by law enforcement, he began telling a version of events that conformed more closely to that evidence. Steckel admitted changing his version of events multiple times.

{¶ 127} On the other hand, Mickael provided eyewitness testimony to Steckel's unprovoked killing of all four victims. Mickael's testimony was consistent with and corroborated by the photographic and medical evidence. If jurors believed Mickael, her testimony alone supported the jury's verdicts. This was not one of the "exceptional cases"

where the evidence weighed heavily against Steckel's conviction. *Zitney*, 2021-Ohio-466, at ¶ 15 (12th Dist.).

**{¶ 128}** Regarding self-defense, Steckel has presented no argument that the State failed to prove at least one of the three elements required to disprove self-defense.[5] We decline to develop an argument for him in this regard. *See State v. Oghojafor*, 2023-Ohio-44, ¶ 101 (12th Dist.), citing App.R. 16(A)(7).

**{¶ 129}** Steckel also briefly mentions that the prosecutor, during closing argument, accused Steckel of violating a duty to retreat. But Steckel explains, in a footnote, that this comment did not rise to the level of reversible error. Because Steckel has not assigned error to this issue, or articulated any argument in support, we disregard this argument as well. App.R. 16(A)(7).

**{¶ 130}** Our review of the record confirms that the State presented legally sufficient evidence to support each count of aggravated murder and the attendant specifications. The State presented overwhelming evidence—including eyewitness testimony through Mickael—that Steckel, without provocation, shot and killed Andrew, Shawn, Jamie, and Leon. For the same reasons, Steckel's convictions were supported by the greater weight of the evidence and the jury did not lose its way in finding that the State disproved self-defense. We overrule Steckel's fifth assignment of error.

### III. Conclusion

**{¶ 131}** Steckel has failed to demonstrate error in the court's admission of Dr. Casto's autopsy reports. The court did not abuse its discretion in providing jurors with a consciousness-of-guilt instruction, nor did the court err in declining to provide an

---

5. The State is required to disprove self-defense by proving beyond a reasonable doubt that the defendant (1) was at fault in creating the situation giving rise to the affray, or (2) did not have a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape, or (3) violated a duty to retreat or avoid the danger. *State v. McFarland*, 2022-Ohio-2326, ¶ 43 (12th Dist.).

accomplice-testimony instruction. The State did not commit prosecutorial misconduct in admitting evidence of Steckel's willingness to serve "25 years flat." And Steckel's convictions were supported by sufficient evidence and the weight of the evidence.

{¶ 132}  Judgment affirmed.

HENDRICKSON, P.J., and PIPER, J., concur.

## J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Madison County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

/s/ Robert A. Hendrickson, Presiding Judge

/s/ Robin N. Piper, Judge

/s/ Matthew R. Byrne, Judge